NOTICE
Decision filed 12/27/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 190120-U

NO. 5-19-0120

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Lawrence County. |
| | ) | |
| v. | ) | No. 17-CF-48 |
| | ) | |
| DANNY SANDLIN, | ) | Honorable |
| | ) | Robert M. Hopkins, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Vaughan and Wharton concurred in the judgment.

**ORDER**

¶ 1   *Held*:  We reverse defendant's conviction of attempted first degree murder where the attempted first degree murder and aggravated discharge of a firearm charges were based on a single act and subject to compulsory joinder-speedy trial rule. Accordingly, defendant was denied effective assistance of counsel where defense counsel failed to raise a timely motion to dismiss on speedy-trial grounds. The circuit court did not violate defendant's due process rights where a fitness hearing was not required.

¶ 2   Defendant, Danny Sandlin, appeals his conviction after a jury trial in the circuit court of Lawrence County in which he was found guilty of attempted first degree murder (720 ILCS 5/8-4, 9-1(a)(1) (West 2016)), aggravated domestic battery (*id.* § 12-3.3(a)), and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). On appeal, defendant argues that (1) defense counsel was ineffective for failing to file a timely motion to dismiss the attempted first degree murder charge on speedy-trial grounds, (2) the State failed to prove beyond a reasonable doubt the specific intent

1

to kill element of attempted first degree murder, and (3) the court failed to hold a proper fitness hearing after finding a *bona fide* doubt of defendant's fitness to stand trial. For the following reasons, we affirm in part, reverse in part, and remand the cause for a new sentencing hearing.

¶ 3                                      I. Background

¶ 4     On May 16, 2017, defendant was arrested after an armed standoff with law enforcement at his home in Lawrence County. The State later charged defendant by a three-count information on May 24, 2017, alleging that on or about May 16, 2017, defendant committed the offenses of (1) aggravated discharge of a firearm (count I) (*id.* § 24-1.2(a)(2)), a Class 1 felony, in that defendant "discharged a firearm in the direction of a tractor that he knew or reasonably should have known to be occupied by a person"; (2) aggravated domestic battery (count II) (*id.* § 12-3.3(a)), a Class 2 felony, in that defendant, in committing a domestic battery, knowingly caused great bodily harm to his wife, Darlene Sandlin, when he fractured Darlene's wrist by striking her on the arm with the butt end of a rifle; and (3) unlawful possession of a weapon by a felon (count III) (*id.* § 24-1.1(a)), a Class 3 felony, in that defendant, being a person who had been convicted of a felony under Illinois law, knowingly possessed an SKS rifle.

¶ 5     Following his preliminary hearing, defendant entered a plea of not guilty, and the circuit court set a pretrial conference date for July 5, 2017. The court subsequently denied defendant's request for a bond reduction, and defendant remained in custody.

¶ 6     On July 5, 2017, defense counsel indicated to the circuit court his intention to file a petition for a fitness examination.[1] Defense counsel subsequently filed a petition for a fitness examination

---

[1]We note that this request is not reflected in the common law record on appeal. However, a review of the report of proceedings indicates the parties agreed that July 5, 2017, was the date defense counsel had requested an examination of defendant to determine if he was fit to stand trial. For speedy-trial purposes, the July 5, 2017, date was agreed upon by the parties and accepted by the circuit court as the date defense counsel indicated his intent to file a motion concerning defendant's fitness.

alleging on July 12, 2017, that he had a *bona fide* doubt as to defendant's fitness to stand trial.

¶ 7    On July 26, 2017, the circuit court held a hearing. The docket notes read: "PD. TO FILE PEITITON REVIEWING ISSUE OF FITNESS & TENDERED AGREED ORDER APPOINTING DR. CODISPOTI." (Emphasis in original.) The next day, on July 27, 2017, the court entered the agreed order for Dr. Victoria Codispoti to conduct a fitness examination of defendant.

¶ 8    On September 6, 2017, after receiving Dr. Codispoti's fitness evaluation report, the circuit court held a status hearing. At the outset of the hearing, the court stated: "[T]here being no objection, based upon the fitness evaluation performed by Dr. Codispoti, the Court hereby finds the defendant, Danny L. Sandlin, fit to stand trial." Defense counsel did not object to the entry of the order. Instead, defense counsel immediately informed the court that defendant had been in custody since May 16, 2017, and was requesting a jury trial. Defense counsel acknowledged that on July 5, 2017, he had indicated his intention to file a motion for a fitness evaluation, and the State asserted that the speedy-trial period would toll from the July 5, 2017, date. The court set the case for a final pretrial hearing on November 8, 2017, and for a jury trial commencing on November 13, 2017.

¶ 9    On November 6, 2017, the State filed an amended information alleging that on or about May 16, 2017, defendant committed the offenses of (1) attempted first degree murder (count I) (*id.* §§ 8-4, 9-1(a)(1)), in that defendant, "with the intent to commit the offense of First Degree Murder *** performed a substantial step toward the commission of said offense, in that he personally discharged a firearm, that being a SKS rifle, at Jarrod Banks," enhancing the charge to a Class X felony (*id.* § 8-4(c)(1)(C)) (Class X sentencing range with a mandatory 20-year firearm enhancement); (2) aggravated discharge of a firearm (count II) (*id.* § 24-1.2(a)(2)), a Class 1

3

felony, in that defendant discharged a firearm in the direction of a tractor that he knew or reasonably should have known to be occupied by a person; (3) aggravated domestic battery (count III) (*id.* § 12-3.3(a)), a Class 2 felony, in that defendant, in committing a domestic battery, knowingly caused great bodily harm to his wife, Darlene, in that defendant fractured Darlene's wrist when he struck her on the arm with the butt-end of a rifle; and (4) unlawful possession of a weapon by a felon (count IV) (*id.* § 24-1.1(a)), a Class 3 felony, in that defendant, being a person who had been convicted of a felony under Illinois law, knowingly possessed an SKS rifle.

¶ 10    On November 7, 2017, defendant filed two motions *in limine* requesting that the circuit court exclude evidence of his prior criminal convictions and the custodial interrogation with Reese Ivers of the Lawrence County Sheriff's Department. Additionally, defendant filed a motion to suppress statements he made to Ivers during a custodial interrogation at the Lawrence County jail.

¶ 11    The circuit court held defendant's two-day jury trial on November 13, 2017, and November 14, 2017. At the outset, the court discussed defendant's motions *in limine.* First, in referencing defendant's motion *in limine* to exclude all of defendant's prior convictions, defense counsel informed the court, and the State agreed, that, because one of the pending charges against defendant was a possession of a weapon by a felon (count IV), the State was entitled to present proof of defendant's 1991 conviction in Lawrence County for burglary. The parties agreed that the felony conviction would be presented by stipulation for the limited purpose of proving that defendant was a convicted felon as alleged in count IV. In addition, defense counsel informed the court that the parties had resolved defendant's motion to suppress statements by agreeing to exclude Ivers as a witness altogether, thus, eliminating any testimony concerning conversations at the Lawrence County jail between defendant and Ivers.

4

¶ 12    Following opening statements, the State called Steven Posth to testify. Posth testified that he and his wife were next door neighbors to defendant and Darlene. On the date of the incident, Posth and his wife were outside of their home, about 150 yards from defendant's home, when they heard defendant "hanging out of the window" while he was "yelling and waiving [*sic*] his hand up." Shortly thereafter, Posth and his wife heard two gunshots coming from the direction of defendant's home. Posth called police. Posth testified that defendant's home did not have windows.

¶ 13    The State called Jarrod Banks to testify. Banks worked at Ivers Brothers Farms where he had been employed for 20 years. Banks testified that on May 16, 2017, sometime between 5 p.m. and 7 p.m., he was driving a tractor between "Albert Lawrence's residence and [defendant's] residence" when he heard a "popping noise" and saw "sparks fly from the right front of the tractor." Initially, he thought there was an electrical fire in the tractor. At that time, he continued to drive the tractor while he called a colleague at Ivers Brothers Farms to request the fire department. A few minutes later, however, Banks observed two of the tractor's windows blow out. Banks believed the tractor was on fire, so he stopped the tractor and turned it off. He then exited the tractor. As he walked around the tractor, he saw a hole in one of the tractor's side doors. Banks testified that he "did a quick 360 to see *** what was going on, and then [he] saw somebody staring [in] a window at Mr. Sandlin's house." Confused and seeking protection, Banks walked to the opposite side of the tractor away from defendant's house. After discovering that he had been shot at while driving the tractor, Banks made another call to a colleague at Ivers Brothers Farms, requesting that the police be notified.

¶ 14    Banks testified that when the police arrived several minutes later, he could hear defendant yelling and screaming. After the police had secured the scene, Banks found a second bullet hole

5

in the side of the tractor. Banks testified that the bullet had hit a steel plate that was located eight inches to the right of where he was sitting. Banks indicated that the steel plate was 3/16 thick and three to four inches high. When asked what would have happened if the steel plate had not been installed on the right side of the tractor, Banks stated, "I know the bullet would've been in my side because there's nothing but plastic between me and that steel plate." Banks also testified that he was grateful he was driving north, and the right side of the tractor was facing defendant, because the left side of the tractor was "completely open" with a "full glass door." Lastly, the State asked Banks if he "could imagine if the round had gone a little bit higher, where would that round have ended up?" Banks responded, "Probably my head."

¶ 15     Next, the State called Darlene to testify. She testified that on May 16, 2017, after returning home from McDonald's, she and defendant were in their home when defendant became upset. Darlene denied that she used drugs but acknowledged that she was aware of defendant's use of methamphetamine (meth) in their home. Darlene testified that defendant did not use meth on the day of the incident, which is why she believed he was so upset. Darlene testified that she was sitting next to a window in the living room when she heard more than two shots coming from the bedroom. After defendant fired the shots, he came out of the bedroom and was very angry. He got a cigarette and then struck Darlene in the head with his fist. Defendant then went back to the bedroom. Darlene then identified the gun used by defendant (State's Exhibit 11) to fire the shots. Darlene testified that after defendant exited the bedroom a second time, he hit her wrist with the gun. She recounted that she was unable to move her arm following the injury. After this encounter, defendant went back into the bedroom, and Darlene exited the house to talk with police. Darlene testified that she was transported by ambulance to a hospital, where x-rays confirmed she had a fractured arm.

¶ 16   On cross-examination, Darlene denied using meth or ever telling a police officer that she needed meth. Darlene acknowledged that she had been diagnosed with schizophrenia. When asked by defense counsel if she had fired the gun, she denied such action. On redirect, Darlene confirmed that she neither handled nor fired defendant's gun on May 16, 2017.

¶ 17   The State then called Deputy Kyle Gilmore of the Lawrence County Sheriff's Department to testify. Deputy Gilmore testified that he received information on May 16, 2017, between 7 p.m. and 8 p.m. that there was an individual acting in an erratic manner at his residence. Before Deputy Gilmore arrived at defendant's home, the dispatcher reported that there was a possible shooter. Upon arrival, Deputy Gilmore observed defendant holding a long rifle through a window of the house. Deputy Gilmore was accompanied by Chief Billy Darnell of the St. Francisville Police Department. Deputy Gilmore testified that Chief Darnell, using a PA system, requested defendant to exit the house, but defendant refused. Deputy Gilmore testified that Darlene exited the home while defendant continued to yell and scream profanities. Several hours later, after Chief Darnell had contacted defendant by phone, defendant exited the home and was placed under arrest. Defendant was later transported to a hospital. Deputy Gilmore also testified that he and several other officers entered defendant's home in the early morning hours of May 17, 2017, after obtaining a search warrant. Defendant's rifle and ammunition were located in the northwest bedroom and more ammunition was found in the kitchen.

¶ 18   Following a short recess, the State called Bridget Howard, a crime scene investigator for the Illinois State Police, to testify. Howard testified that she was assigned to process the scene of a search warrant at defendant's residence. Upon arrival, she first investigated a tractor that was parked in the middle of a nearby field. As she approached the tractor, Howard noticed windows were broken on the left and back sides of the tractor. She also noticed that there was glass all over

7

the ground and there were two bullet holes in the tractor, one located in a battery access door and the other in a black switch box attached to the seat of the tractor. When Howard opened up the black switch box, she noticed that the bullet had struck the box, but the bullet had not gone through the box. Instead, the bullet had struck a steel plate that was located inside the black switch box. Howard then identified a photo (State's Exhibit 5) depicting the tractor seat where Banks had been sitting during the shooting. The tractor seat was located on the other side of the steel plate. The State then moved to admit into evidence, without objection, several photos Howard had taken of the scene on May 17, 2017.

¶ 19    The photos depicted the following: (1) the tractor (State's Exhibit 1); (2) the upper area of the battery-access door showing a bullet hole (State's Exhibit 2); (3) a closer view of the battery-access door showing the bullet hole (State's Exhibit 3); (4) the inside view of the battery-access door depicting where the bullet hole exited after going through the door (State's Exhibit 4); (5) the tractor seat and the black switch box that was attached to the armrest of the tractor with a bullet hole in a steel plate that was inside the switch box (State's Exhibit 5); (6) the backside of the switch box unscrewed from the steel plate depicting that the steel plate stopped the bullet (State's Exhibit 6); (7) a photo of the steel plate with small pieces of projectile (State's Exhibit 8); and (8) the spent projectile jacket that was discovered at the bottom of the black switch box and other pieces collected from the backside of the box between the steel plate (State's Exhibit 16).

¶ 20    Howard then accompanied deputies through a search of the residence. The search of the northwest corner of the residence uncovered several live rounds of ammunition, defendant's rifle, and spent casings. Howard then identified a photo she had taken of the items (People's Exhibit 10). According to Howard, she could clearly see the tractor from this window. The State, without

8

objection, moved to admit into evidence People's Exhibit 10 and then moved to admit People's Exhibit 11, depicting the rifle that was also photographed in People's Exhibit 10.

¶ 21    Howard indicated that when the rifle was found in the northwest bedroom, it was loaded with nine live rounds of ammunition and one round in the chamber. Next, Howard identified five spent rifle casings and two live rounds of rifle ammunition that she had collected from the floor of the northwest bedroom (People's Exhibit 19). The State, without objection, moved to admit into evidence People's Exhibit 19. Lastly, Howard confirmed, and the State, without objection, moved to admit a photo of two light bulbs with residue on them, a lighter, and a screwdriver in the northwest bedroom where the rifle had been located (People's Exhibit 14). Howard indicated that the home, which was located about a quarter of a mile from the tractor, did not have windowpanes in the windows and the home was rundown. Lastly, Howard indicated that, although the rifle was sent to the lab, she was uncertain if it was processed for fingerprints.

¶ 22    Next, the State called Chief Darnell to testify. Chief Darnell was employed by the St. Francisville Police Department on May 16, 2017. Chief Darnell testified that he responded to a call that shots had been fired at a tractor west of Sand Barrens. Upon arrival, he called for backup and "staged" the area in a position where he could observe the defendant's house. After Deputy Gilmore arrived, the two officers drove closer to defendant's house. As Chief Darnell exited his squad car, he spotted Darlene sitting in what he believed was the living room. Chief Darnell, who knew defendant prior to this incident, attempted to communicate with defendant through the loudspeaker on his car. After attempting to initiate a conversation with defendant, Deputy Gilmore informed Chief Darnell that he could see defendant from the west side of the house. Again, Chief Darnell attempted to communicate with defendant from the loudspeaker. Chief Darnell testified that defendant was unresponsive other than "cursing at us and ranting." Around that same time,

9

Chief Darnell received information from the dispatcher that "a subject has been in a tractor and was shot at from that location out of a window."

¶ 23   Chief Darnell testified that the Illinois State Police along with several local police departments arrived on scene to assist Chief Darnell and Deputy Gilmore. At some point, Darlene exited the residence and approached the Illinois State Police. After obtaining defendant's cell phone number, Chief Darnell called defendant. Defendant answered and continued to yell and express himself angrily. Chief Darnell testified that defendant was extremely angry, making threatening remarks several times that "he had plenty of bullets for all of us [police] and that he wasn't afraid to shoot us." According to Darnell, "it was pretty clear *** that if someone was to go in the house they would've probably got shot." Chief Darnell testified that defendant eventually calmed down and agreed to leave the gun on the bedroom floor and exit the residence.

¶ 24   Before the State closed its case-in-chief, the circuit court accepted an agreed stipulation that defendant had been convicted of the offense of burglary, a Class 2 felony, in Lawrence County on November 6, 1991, and sentenced to 30 months' probation. The State rested its case, and defense counsel then moved for a directed verdict on the basis that the State did not prove beyond a reasonable doubt all of the elements on any of the four counts, which the court denied.

¶ 25   Defendant did not testify or present evidence on his behalf. Following closing arguments, the jury found defendant guilty of all four counts, attempted first degree murder, aggravated domestic battery, aggravated discharge of a firearm, and unlawful possession of a weapon by a felon. The jury also concluded that the State had proven that defendant personally discharged a firearm during the attempted first degree murder.

¶ 26   On December 8, 2017, after first denying a motion for new trial filed by defendant, the circuit court held defendant's sentencing hearing. The court did not impose a sentence on the

10

charge of aggravated discharge of a firearm (count II) because it found, as the State had indicated, the offense involved the "same act" as the offense of attempted first degree murder (count I). As to attempted first degree murder (count I), defendant was sentenced to 32 years' imprisonment, which comprised of 12 years' imprisonment for attempted first degree murder with a 20-year firearm enhancement for personally discharging a firearm during the attempted first degree murder. Additionally, defendant was sentenced to concurrent sentences with respect to the aggravated domestic battery (count III) and unlawful possession of a weapon by a felon (count IV).

¶ 27 On December 21, 2017, defendant filed a *pro se* motion to reconsider. Defendant argued that he received ineffective assistance of counsel when defense counsel: (1) did not allow defendant to review discovery materials before trial, (2) manipulated defendant not to testify, (3) never advised defendant that he was eligible for a mandatory 20-year enhanced sentencing if he was found guilty, and (4) failed to advise defendant about the specifics of a plea bargain if defendant did not go to trial. In addition, defendant claimed the State and circuit court erred in failing to advise defendant about the potential 20-year enhanced sentence and to the specifics of the State's plea offer, which provided a lesser sentencing range.

¶ 28 On December 29, 2017, defendant, through defense counsel, filed a motion to reconsider advising the circuit court that "[d]efendant's [*pro se*] Motion and its allegations should be considered by this Court." Considering the allegations of ineffective assistance of counsel, defense counsel requested the appointment of a different attorney to represent defendant, including amending and supplementing defendant's motion to reconsider. Shortly thereafter, defendant's original attorney withdrew, and defendant was appointed new counsel. Over the next two years, defendant's status hearings were continued several times.

¶ 29    On February 22, 2019, defendant filed a motion to reconsider sentence arguing that his sentence was excessive. Defendant claimed the circuit court failed to consider any factors in mitigation, as well as defendant's past history of criminality, mental history, family situation, economic status, education, occupation, and personal habits.

¶ 30    On March 22, 2019, following a hearing, the circuit court denied defendant's motion to reconsider sentence. Defendant was informed of his right to appeal. That same day, defendant filed a timely appeal. After being appointed counsel on March 25, 2019, defendant filed an amended notice of appeal on April 8, 2019.

¶ 31                                    II. Analysis

¶ 32    On appeal, defendant raises three points of contention. First, defendant argues that defense counsel's failure to file a timely motion to dismiss, thus forfeiting his right to a speedy trial, constituted ineffective assistance of counsel. In particular, defendant claims that the State violated the Speedy-Trial Act (725 ILCS 5/103-5 (West 2016)) where the attempted first degree murder charge was subject to compulsory joinder and the State failed to charge defendant with the offense until after the speedy-trial period had expired. Second, defendant argues that the State failed to prove beyond a reasonable doubt the specific intent to kill element of attempted first degree murder. Finally, the defendant contends that the court failed to hold a proper fitness hearing after finding a *bona fide* doubt of defendant's fitness to stand trial. We agree with defendant that defense counsel was ineffective for failure to file a timely motion to dismiss on speedy-trial grounds.

¶ 33    This court recognizes that defendant did not properly preserve his argument that defense counsel was ineffective for failure to file a timely motion to dismiss on speedy-trial grounds. However, claims of ineffective assistance of counsel may be raised on direct appeal when the basis of the claim can be ascertained from the record. *People v. Schaefer*, 2020 IL App (5th) 180461,

12

¶ 16 (citing *People v. Veach*, 2017 IL 120649, ¶ 49; *People v. Watson*, 2012 IL App (2d) 091328, ¶ 21). We believe the record is sufficient to resolve defendant's ineffective assistance of counsel claim on direct review. In reviewing an ineffective assistance of counsel claim, we review the ultimate issue of whether counsel was ineffective *de novo. Id.* (citing *People v. Berrier*, 362 Ill. App. 3d 1153, 1166-67 (2006)).

¶ 34    A defendant alleging ineffective assistance of counsel must establish that his attorney's performance fell below an objective standard of reasonableness and that this deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant must prove a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is one that sufficiently undermines confidence in the outcome of the proceeding. *People v. Barrow*, 195 Ill. 2d 506, 534 (2001). The defendant's failure to satisfy either prong of *Strickland* defeats an ineffective assistance claim. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001).

¶ 35    Section 103-5(a) of the Code of Criminal Procedure of 1963 mandates that: "[e]very person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant ***." 725 ILCS 5/103-5(a) (West 2016). Under subsection (a), a defendant's right to a speedy trial is automatic, and the State must bring the defendant to trial within 120 days. *People v. Garrett*, 136 Ill. 2d 318, 324 (1990). If a defendant is not tried within the statutory period, then the defendant must be released and the charges dismissed. 725 ILCS 5/103-5(d) (West 2016); *People v. Woodrum*, 223 Ill. 2d 286, 299 (2006). Application of the speedy-trial principles is straightforward; however, the concept "becomes more complicated when the defendant is charged with multiple, but factually related, offenses at different times." *People v. Williams*, 204 Ill. 2d 191, 198 (2003).

"In such cases[,] the speedy-trial guarantee is tempered by compulsory joinder principles." *Id.*

¶ 36    The interplay between the speedy-trial and compulsory joinder statutes has been described as follows:

"'Compulsory joinder requires the State to bring multiple charges in a single prosecution. The charges are tried together unless the circuit court determines that a separate trial is required in the interest of justice. [Citation.] Once a speedy-trial demand is filed, the multiple charges are subject to the same speedy-trial period. If the charges are required to be brought in a single prosecution, the speedy-trial period begins to run when the speedy-trial demand is filed, even if the State brings some of the charges at a later date.'" *Id.* at 200 (quoting *People v. Quigley*, 183 Ill. 2d 1, 13 (1998)).

¶ 37    Additionally, in *People v. Williams*, 94 Ill. App. 3d 241, 248-49 (1981), although the court did not mention compulsory joinder, it held:

"Where new and additional charges arise from the same facts as did the original charges and the State had knowledge of these facts at the commencement of the prosecution, the time within which the trial is to begin on the new and additional charges is subject to the same statutory limitation that is applied to the original charges."

"'In other words, when the compulsory-joinder rule applies, a delay that occurs on the original charge (or charges) and that is attributable to defendant will not toll the speedy-trial period as to a subsequent charge (or charges), if the delay occurred before the subsequent charge was filed because the subsequent charge was not before the court when the delay occurred.'" *People v. Peters*, 2018 IL App (2d) 150650, ¶ 75 (quoting *People v. Kazenko*, 2012 IL App (3d) 110529, ¶ 13).

¶ 38    The question of whether a subsequent charge is a new and additional charge is intertwined

14

with the question of whether the original and subsequent charges were subject to compulsory joinder. *People v. Moffett*, 2019 IL App (2d) 180964, ¶ 29. Whether charges are subject to compulsory joinder is an issue of law and thus subject to *de novo* review. *People v. Moody*, 2016 IL App (1st) 130071, ¶ 27 (citing see, *e.g.*, *People v. Hunter*, 2012 IL App (1st) 092681, ¶ 2). Additionally, we review *de novo* the question of whether a subsequently filed charged is considered "new and additional." *People v. Phipps*, 238 Ill. 2d 54, 67 (2010).

¶ 39 In the case at bar, there is no dispute that the speedy-trial period for defendant was 120 days, beginning on May 16, 2017, when defendant was taken into custody. The parties do not dispute that the charges at issue were known to the proper prosecuting officer at the time prosecution began or that the charges were within the jurisdiction of a single court. Moreover, the parties do not dispute that the charges were based upon the same act. The two offenses at issue arose from a single incident, but the State filed charges against defendant on two different dates. At the time defendant was initially charged on May 24, 2017, the State knew all of the facts surrounding the incident. Specifically, that defendant had shot at a moving tractor with an SKS rifle that defendant knew or should have known was driven by an individual, who was subsequently identified as Jarrod Banks on November 6, 2017, in the later amended information. Accordingly, the facts support a determination that defendant committed a single act within the meaning of the compulsory-joinder statute, and the State was required to charge him with all of the offenses arising therefrom in a single prosecution.

¶ 40 Having determined that compulsory-joinder principles apply, we must determine if defendant's speedy-trial rights were violated. As such, our next determination hinges on whether the subsequent charge was "new and additional." The State asserts that defendant's speedy-trial rights were not violated. With reliance on the supreme court's ruling in *Phipps*, 238 Ill. 2d at 69-

15

70, the State contends that, because the original information gave defendant adequate notice of the subsequent charge to prepare his defense, the rule set forth in *Williams* does not apply. See *Williams*, 94 Ill. App. 3d at 248-49 ("Where new and additional charges arise from the same facts as did the original charges and the State had knowledge of these facts at the commencement of the prosecution, the time within which trial is to begin on the new and additional charges is subject to the same statutory limitation that is applied to the original charges."). Specifically, the State asserts that, because the subsequent charge was not new and additional, any delays attributable to defendant on the aggravated discharge of a firearm charge were also attributable on the subsequent attempted first degree murder charge. We find the *Phipps* case distinguishable to the case at hand.

¶ 41    Our supreme court in *Phipps*, 238 Ill. 2d at 68, found that the original information and subsequent charging instrument alleged the same conduct—that the defendant drove a motor vehicle under the influence of alcohol and collided with another vehicle, causing the death of the victim. The *Phipps* court noted that the State did not charge defendant with a version of the reckless homicide statute in effect at the time of his April 5, 2004, offense. *Id.* at 69. In considering the driving under the influence and amended reckless homicide statutes, the court noted that the General Assembly in Public Act 93-213 " 'recharacterized the conduct that had been reckless homicide while under the influence of drugs or alcohol as aggravated driving while under the influence, and retained the sentencing structure of 3 to 14 years' imprisonment.' " *Id.* (quoting *People v. Gancarz*, 228 Ill. 2d 312, 322 (2008)). Even though the defendant had been charged under an old statute, the court determined that, because the statutes were identical, the State could, without implicating the speedy-trial and compulsory joinder statutes, replace the incorrect charge with a charge under the new statute for aggravated driving under the influence. *Id.* The court determined that the subsequent charge was not new and additional, thus, any delays attributable to

16

the defendant on the reckless homicide charge were also attributable to him on the subsequent charge. *Id.* at 70.

¶ 42    By contrast, here, the newly filed charge on November 6, 2017, alleged a greater class of felony (Class X as opposed to Class 1) and a much greater possible sentencing range. Moreover, the new charge required proof of different elements, in particular, that defendant, by discharging his SKS rifle, performed an act that constituted a substantial step toward the commission of first degree murder and that defendant did so with the specific intent to kill Jarrod Banks. Unlike *Phipps*, this is not a case where the late-filed charge is an identical offense. Additionally, neither offense is a lesser-included or lesser-mitigated offense of the other. See *People v. Staake*, 2016 IL App (4th) 140638, ¶ 71. As such, we conclude that the subsequent charge was new and additional for speedy-trial purposes. Thus, while the speedy-trial period for the aggravated discharge of a firearm relates back to the filing of the original indictment, any delays attributable to defendant on the aggravated discharge of a firearm[2] were not attributable to him on the subsequent charge. Accordingly, we reject the State's argument that defendant's right to a speedy trial was not violated due to delays attributable to him. We, instead, conclude that the State's failure to file the attempted first degree murder charge within the requisite time period violated his speedy-trial rights.

---

[2]It is well settled that the filing of a motion to suppress tolls the speedy-trial statute (*People v. Jones*, 104 Ill. 2d 268, 277 (1984)). Additionally, the speedy-trial term was tolled for defendant's fitness examination by an expert. *People v. Clark*, 148 Ill. App. 3d 669, 677 (1986) ("[T]he speedy[-]trial term is tolled by such an examination for the time during which the examination is conducted, even though no fitness hearing is found to be necessary following the examination."); see also *People v. Schmidt*, 233 Ill. App. 3d 512, 515 (1992) (court determined the defendant's request for a fitness evaluation was a delay attributable to the defendant); *People v. Jones*, 215 Ill. App. 3d 652, 656 (1991) (delay was chargeable to defendant because of defendant's request for a fitness examination).

Moreover, defendant filed a motion to suppress statements on November 7, 2017. This delay occurred after the filing of the subsequent charge. As such, this delay is attributable to defendant on the subsequent charge. *Peters*, 2018 IL App (2d) 150650, ¶ 75. Nevertheless, the State filed the attempted first degree murder charge well after the statutory speedy-trial period had expired, thus, a speedy-trial violation still occurred.

¶ 43    Having determined that defendant's speedy-trial rights were violated, this court can find no strategic reason for defense counsel's failure to move to dismiss the subsequently filed attempted first degree murder charge against defendant. Therefore, counsel's inaction altered the outcome of the case given defendant was convicted on the subsequent charge of attempted first degree murder. As a result, defense counsel's deficient performance in failing to raise the speedy-trial violation in a timely motion to dismiss resulted in prejudice to defendant. Accordingly, we find that defendant has established that he received ineffective assistance of counsel resulting from defense counsel's failure to assert a speedy-trial violation where one existed. We therefore reverse defendant's attempted first degree murder conviction outright. See *People v. Mooney*, 2019 IL App (3d) 150607, ¶ 31. Given our determination, this court need not address defendant's second argument on appeal concerning the State's failure to prove beyond a reasonable doubt the element of intent as it relates to the attempted first degree murder conviction.

¶ 44    Finally, defendant contends that the circuit court failed to hold a proper fitness hearing after finding a *bona fide* doubt of defendant's fitness to stand trial. The determination before this court is whether the circuit court's grant of defendant's request for a fitness examination implicitly signaled the court's belief that there was a *bona fide* doubt as to defendant's fitness, necessitating a fitness hearing. Defendant concedes that he forfeited the issue by failing to object in the circuit court but asks this court to review the issue under the plain error doctrine. We will decide the issue on its merits because it implicates defendant's substantial right in obtaining due process of law. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 2. *Medina v. California*, 505 U.S. 437, 439 (1992); *People v. Sandham*, 174 Ill. 2d 379, 382 (1996).

¶ 45    A defendant is presumed to be fit to stand trial. 725 ILCS 5/104-10 (West 2016). A defendant is unfit if, because of his mental or physical condition, he is unable to understand the

18

nature and purpose of the proceedings against him or to assist in his defense. *Id.* A defendant may be fit to stand trial even though the defendant's mind is otherwise unsound. *People v. Eddmonds*, 143 Ill. 2d 501, 519 (1991). Whether a *bona fide* doubt exists is generally a matter within the discretion of the circuit court. *Sandham*, 174 Ill. 2d at 383.

¶ 46    On July 5, 2017, defense counsel orally indicated to the circuit court his intention to file a motion for a fitness examination. There is no report of proceedings of the July 5, 2017, hearing; however a review of the September 6, 2017, status hearing reveals, according to the court, that the parties had agreed that defense counsel had "indicated [his] intention to file *** a motion concerning the fitness of the defendant" on July 5, 2017. We note there is no indication in the record that the State objected to defense counsel's oral motion to file this petition. One week later, on July 12, 2017, defense counsel filed a petition for a fitness examination, pursuant to section 104-11, alleging a *bona fide* doubt as to defendant's fitness to stand trial and requesting the circuit court order a fitness examination of defendant by an expert. 725 ILCS 5/104-11 (West 2016). Defense counsel did not cite a specific statute under section 104-11 concerning the fitness evaluation and did not provide specific reasons for his doubt.

¶ 47    A review of the common law record indicates that the circuit court held a hearing on defense counsel's petition on July 26, 2017. The docket entry following this hearing states that defense counsel was to file a petition reviewing the issue of fitness and tender an agreed order appointing Dr. Codispoti to evaluate defendant. There is no report of proceedings for the July 26, 2017, hearing. The court's order, tendered by defense counsel, was titled, "ORDER FOR FITNESS EVALUATION," and stated, "this Court FINDS that there is a bona fide doubt as to Defendant's fitness to stand trial and ORDERS" Dr. Codispoti to perform an examination of defendant. (Emphasis in original.) On July 27, 2017, the court ordered Dr. Codispoti to conduct a

19

fitness examination of defendant, which she performed on August 12, 2017. Dr. Codispoti's report was filed on September 6, 2017. On that same day, the circuit court held a status hearing.

¶ 48    At the outset of the September 6, 2017, status hearing, the circuit court stated the following: "[T]here being no objection, based upon the fitness evaluation performed by Dr. Codispoti, the Court hereby finds the defendant, Danny L. Sandlin, fit to stand trial." There was no objection by defense counsel. Additionally, the docket entry contained in the common law record for September 6, 2017, states: "CT FINDS DEF. IS COMPETENT TO STAND TRIAL BASED ON REPORT OF DR. CODISPOTI." (Emphasis in original.)

¶ 49    Defense counsel's petition for a fitness examination and the circuit court's order for fitness examination do not specify whether the examination was ordered under section 104-11(a) or section 104-11(b). 725 ILCS 5/104-11(a), (b) (West 2016). The supreme court in *People v. Hanson*, 212 Ill. 2d 212, 217 (2004), made a distinction between sections 104-11(a) and (b), stating the following:

"Sections 104-11(a) and (b) may be applied in tandem or separately, depending on if and when the trial court determines a *bona fide* doubt of fitness is raised. If the trial court is not convinced *bona fide* doubt is raised, it has the discretion under section 104-11(b) to grant the defendant's request for appointment of an expert to aid in that determination. [Citation.] Even for a motion filed under section 104-11(a), the trial court could specify its need for a fitness examination by an expert to aid in its determination of whether a *bona fide* doubt is raised without a fitness hearing becoming mandatory. In either instance, after completion of the fitness examination, if the trial court determines there is *bona fide* doubt, then a fitness hearing would be mandatory under section 104-11(a) [citation].

[Citation.] Conversely, if after the examination the trial court finds no *bona fide* doubt, no further hearings on the issue of fitness would be necessary."

Thus, section 104-11(b) does not conclusively establish *bona fide* doubt has been raised merely because a request for a fitness examination has been granted. *People v. Brown*, 212 Ill. 2d 212, 218 (2004). Because a court can order a fitness examination for the very purpose of determining whether "a bona fide doubt as to *** fitness *** may be raised" (725 ILCS 5/104-11(b) (West 2016)), it must follow that merely ordering such an examination does not necessarily imply a finding of *bona fide* doubt. *People v. Hill*, 345 Ill. App. 3d 620, 626 (2003).

¶ 50    Defendant argues that the circuit court found a *bona fide* doubt existed concerning his fitness, thus, a fitness hearing was mandatory. We acknowledge that the court's July 27, 2017, agreed "ORDER FOR FITNESS EVALUATION" states that "this Court FINDS that there is a bona fide doubt as to Defendant's fitness to stand trial and ORDERS" Dr. Codispoti to perform an examination of defendant. (Emphasis in original.) Despite this language, the court's order does not reference a fitness hearing, and the record does not support defendant's argument that the circuit court found *bona fide* doubt existed concerning defendant's fitness prior to defendant's fitness examination with Dr. Codispoti.

¶ 51    Rather, the July 26, 2017, docket entry indicates that the circuit court ordered an evaluation and set a date for a status hearing to review the results of the evaluation on August 23, 2017, and then later on September 6, 2017, following defendant's fitness examination that took place on August 12, 2017. In addition, defendant's petition made no reference at all to sections 104-11(a) or (b). Thus, the language in defendant's own motion fails to advance his argument that the circuit court was required to hold a fitness hearing under section 104-11(a). See *Hanson*, 212 Ill. 2d at 219-20 (determined defendant's motion, which made no reference to either section 104-11(a) or

21

(b), did not support the argument that the circuit court was bound to hold a fitness hearing under section 104-11(a)). Moreover, similar to *Hanson*, here, the record does not support a finding that defendant requested a fitness hearing, or that the court ordered one, at any point in the proceeding. *Id.* at 221 (defendant only requested an expert be appointed to perform a psychological examination " 'to determine the Defendant's fitness to stand trial, as well as her [*sic*] mental condition at the time of the alleged offense' "). Instead, the plain language of the petition requesting a fitness examination of defendant clearly states that it sought to have defendant examined by an expert. As such, the record supports a finding that the court was not yet convinced that there was a *bona fide* doubt, which indicates that section 104-11(b) applies. Absent a *bona fide* doubt of defendant's fitness to stand trial, defendant was not entitled to a fitness hearing under section 104-11(a). We therefore affirm the court's finding of fitness.

¶ 52                                    III. Conclusion

¶ 53    For the reasons stated, we affirm the circuit court of Lawrence County's finding of fitness but reverse defendant's conviction outright for attempted first degree murder and conclude that defendant was denied effective assistance of counsel where defense counsel failed to raise a timely motion to dismiss on speedy-trial grounds. Accordingly, we affirm in part and reverse in part the judgment of the circuit court. Additionally, we remand the cause for a new sentencing hearing.

¶ 54    Affirmed in part and reversed in part; cause remanded for a new sentencing hearing.