NOTICE

Decision filed 05/28/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240782-U

NO. 5-24-0782

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 20-CF-309 |
| | ) | |
| EDWARD T. WEAVER JR., | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: Despite the search warrant for Facebook messages lacking probable cause, the admission of the Facebook messages was permissible under the inevitable-discovery doctrine, and firearm evidence was admissible for the purpose other than to show propensity. The State's closing arguments and improper lay opinion testimony did not constitute plain error. However, defense counsel provided ineffective assistance by failing to file a motion to dismiss defendant's attempted first degree murder and aggravated discharge of a firearm charges based on a violation of his statutory speedy-trial rights.

¶ 2    Defendant, Edward T. Weaver Jr., appeals his convictions and sentences for unlawful possession of a weapon by a felon and attempted first degree murder of Farice Campbell, which was merged with defendant's convictions for aggravated discharge of a firearm and aggravated battery. Defendant contends trial counsel was ineffective for not filing a motion to dismiss the attempted first degree murder and aggravated discharge of a firearm charges based on a violation

1

of defendant's statutory speedy-trial rights. Defendant also asserts that there was insufficient evidence of attempted first degree murder, the trial court made evidentiary errors, and the State engaged in prosecutorial misconduct during closing.

¶ 3                                    I. BACKGROUND

¶ 4      Farice Campbell was shot while he was parked in his rental car outside of his apartment at 202 North 14th Street, Murphysboro, Illinois, on the night of July 15, 2020, resulting in an injury to his hand. No witness identified the shooter, but through its investigation, the police believed defendant was a suspect. On July 17, 2020, police executed a search warrant on a Dodge Stratus registered to defendant and Samantha Brown. In the trunk of the Dodge Stratus, police found a duffel bag containing several firearms that had been reported stolen.

¶ 5      Defendant was arrested on August 14, 2020. Three days later, defendant was charged, by information, with aggravated battery with a firearm in that he knowingly and without legal justification shot Campbell in the left hand (720 ILCS 5/12-3.05(e)(1) (West 2020)). The information also charged defendant with aggravated possession of a stolen firearm in that he possessed not less than 11 and not more than 20 firearms while knowing the firearms were stolen or converted (*id.* § 24-3.9(a)(3)), and unlawful use of a weapon by a felon in that defendant was a felon and possessed a firearm (*id.* § 24-1.1(a)).

¶ 6      On September 1, 2020, the court found probable cause. Defense counsel waived formal reading of the charges and made a speedy-trial demand. The court stated, "We will go ahead and set it within that 120-day timeframe. I will be straight with you. Obviously the COVID-19 pandemic is affecting settings somewhat, but for now we'll set it during that timeframe for you, Mr. Weaver, okay." Defendant had no objection.

¶ 7    At the following status hearing, the court kept the trial date, which was within the 120-day statutory period. The court again mentioned COVID-19 may cause issues with setting the trial safely but left the case on as scheduled at that point. Defense counsel acknowledged that rescheduling may be inevitable due to COVID-19 but stated that the defense would object to rescheduling the jury trial and wanted to maintain defendant's speedy-trial rights.

¶ 8    At the pretrial hearing on February 23, 2021, defense counsel again noted its desire to keep the scheduled trial date despite the issues caused by COVID-19. Counsel also noted that there was a potential for new charges to be filed, and he advised defendant of this fact. The State noted that its understanding was that the defense rejected the partially negotiated plea offer and it would file new charges sometime that week that would "increase the severity of this case." The new charges were the attempted first degree murder and aggravated discharge of a firearm noted above.

¶ 9    Over the course of the next two years, the court appointed new counsel for defendant several times. As such, the defense requested several continuances with each change in counsel so that new counsel could adequately review the case prior to trial.

¶ 10    On March 2, 2023, counsel filed a motion to suppress any evidence relating to a Facebook account profile—purportedly associated with defendant—identified as https://www.facebook.com/terran.weaver.94. The motion argued the search warrant lacked probable cause on its face where the application indicated that Campbell and Jolene Caraker argued via "messages" the day before the shooting. It contended there was no description of what type of messages and did not indicate the messages were through Facebook. It further noted there was no mention in the application that the messages included defendant in any way. The motion asserted that law enforcement was granted four other search warrants on July 22, 2020, related to Caraker

3

and defendant, pursuant to these proceedings and a review of the discovery provided by the State indicated that no relevant information was discovered from these four search warrants.

¶ 11    The search warrant application at issue here requested various account information from the Facebook account associated with defendant, including "Private Messages sent and received during the period of time from July 1, 2020[,] to July 20, 2020." Sergeant Cory Etherton was the complainant seeking the search warrant. The search warrant complaint stated that the Murphysboro Police Department received multiple reports of gunshots near North 14th Street and Manning Street in Murphysboro, Illinois, on July 15, 2020. Upon arrival, officers located Farice Campbell near the south side of the apartment complex at 202 North 14th Street, with an apparent gunshot wound to his hand. Campbell's rental Jeep, which was nearby, and the apartment complex also sustained gunfire damage. All of the damage appeared to have the same line of fire.

¶ 12    The complaint further stated that Campbell advised officers he did not know who had shot him, as he had not seen anyone around while outside of his apartment. Campbell identified Jolene Caraker as the only person who would be mad or upset with him. He explained they were in a relationship and two days prior, they began arguing. Due to the argument, Campbell informed Caraker that she needed to leave his apartment and take her things with her. She left as requested. Campbell further told officers that in the following days, he and Caraker argued via "messages." He admitted to not being very nice to Caraker and threatening to tell her employer about her drug use. Campbell later explained to police that the day that he argued with Caraker at his apartment, a man known as "Security" was with Caraker. The complaint said "Security" was the street name for defendant. Campbell also advised that defendant acted more as a mediator and that Campbell was meaner to defendant than defendant was to him.

4

¶ 13     The complaint also stated that one of Campbell's neighbors overheard an argument between Campbell and a female a couple of days prior to the shooting. The neighbor advised that she overheard the female say something along the lines of "I'll have my boyfriend kill you." A neighbor from a nearby apartment complex also told police that she observed, around 9:40 p.m., an out-of-place vehicle in a nearby parking lot on the night of the shooting. The same neighbor later advised that she believed the vehicle was a gray or silver Dodge Stratus. The neighbor subsequently stated the Dodge Stratus was gold.

¶ 14     The complaint noted that a vehicle consistent with the neighbor's description was seen on surveillance video from a nearby church at approximately 9:57 p.m., a few minutes after the shooting was reported. Upon searching the Murphysboro Police Department's system, it was discovered that defendant and Samantha Brown were the registered owners of a gold 2000 Dodge Stratus. Officers further determined Brown lived at 1912 Gartside Street in Murphysboro, Illinois. When officers traveled to that address, they observed a gold Dodge Stratus with damage to the passenger side mirror, which was hanging down but still attached. Officers again reviewed the video surveillance from the church and determined the vehicle leaving the area around the time of the shooting had similar damage. The application further stated:

> "It is known that items such as electronic storage devices, including but not limited to cellular phones, tablets, computers, etc. have the capability of storing GPS locations where they were used at. It is known to law enforcement that items such as cellular phones are commonly used to facilitate criminal activity."

¶ 15     On March 3, 2021, the State filed the second amended information which included the original charges but added five new counts. Count I charged attempted first degree murder and alleged that defendant shot at Campbell with the intent to kill Campbell (*id.* §§ 8-4(a), 9-1(a)(1)).

This count also alleged that defendant personally discharged a firearm that proximately caused great bodily harm or permanent disfigurement and thus a mandatory 25-year firearm enhancement applied. Counts IV through VII charged defendant with aggravated discharge of a firearm and alleged that defendant discharged a firearm four separate times in the direction of Farice Campbell (*id.* § 24-1.2(a)(2)). The third amended information was subsequently filed, only amending count IV from "knowingly discharged the first of several shots from a firearm in the direction of another person" to say "knowingly discharged a firearm in the direction of another person."

¶ 16 On June 14, 2023, defense counsel filed a motion to sever the gun possession charges. Regarding the unlawful use of a weapon by a felon charge, counsel argued that the element of a prior felony conviction was prejudicial and wholly irrelevant to the remaining charges. With respect to the aggravated possession of a stolen firearm charge, counsel argued joinder would be prejudicial considering the nature of and proof required for the remaining offenses. Counsel asserted that the State did not allege any of the firearms allegedly in defendant's possession for purposes of the aggravated possession of a stolen firearm were used in the commission of the shooting of Campbell. Counsel further argued that there was a significant risk the trier of fact would use this evidence in determining defendant's guilt or innocence on the remaining charges.

¶ 17 The court held a hearing on all pending motions on September 14, 2023. The parties first addressed the defense's motion to sever counts III and VIII. Defense counsel indicated that depending on the ruling on the motion to sever, the State may need to file a motion *in limine*. Defense counsel argued that where none of the firearms allegedly discovered were involved in the shooting, the possession of stolen firearms count involved a separate investigation and did not relate to the other counts.

¶ 18    The State agreed to sever the unlawful use of weapons by felon count (count VIII) but objected to severing the aggravated possession of a firearm count (count III). The State argued that the firearms possession in count III was directly related to the ownership of the vehicle, which was paramount to its case. It further stated that count III was closely connected to the information elicited from the confidential informant as to the possible location of the gun used in the shooting and the owner of the vehicle involved. The State argued as such, count III and evidence of the firearms discovered in the trunk was intricately connected to the other charges. It alternatively requested that if the court severed both counts, it be allowed to file a motion to admit other-crimes evidence. It further stated it would not have to go into the details of count III and would need to put on only enough evidence to show that there was a link between the possession of the weapons in the vehicle and defendant's ownership of the vehicle.

¶ 19    Defense counsel then requested the court pause on deciding his motion to sever until it could address any motion *in limine* filed by the State regarding this evidence, stating there would be no reason to sever the charges if the evidence could nevertheless be admitted at trial on the remaining charges. The court granted the severance of count VIII and reserved ruling as to count III so the parties could file pleadings on the issue of admitting evidence of the firearms as other-crimes evidence.

¶ 20    Regarding the defense's motion to suppress evidence regarding the Facebook search warrant, defense counsel contended there was nothing in discovery to indicate anyone told police that defendant messaged the victim or that any message between defendant, the victim, and Jolene Caraker were through Facebook. Moreover, the search warrant application makes no mention of Facebook or social media.

7

¶ 21    The State contended it did not need to provide probable cause that a specific message was sent through a specific carrier. It also asserted that the investigation started with knowing that a gold car was near the scene during the shooting, and a search revealed defendant and his wife, Samantha Brown, were the register owners. It argued that electronic storage devices, including phones, have the capability of storing GPS locations where they are used at. "The person investigating the case" believed the person driving the gold car had a Facebook account and thus completed the open search of defendant's Facebook account. The result of the search was the Facebook profile connected to defendant, who was connected to the car and this offense. It further argued, "knowing that electronic devices only communicate with apps," the person investigating the case thought if the person had a Facebook account, then they might have messages leading to the criminal activity. The State also argued that the term "messages" in current society means "everything is on the table now days: Snapchat messages, Facebook messages, text messages."

¶ 22    The State also asserted that it did not have to specifically mention Facebook and it only needed "a suggestion that this could aid in the investigation and there is probable cause to believe that he is involved in that." It therefore sought a search warrant because "he has a Facebook profile and there was probable cause to believe that he was the primary suspect in this investigation." The court denied the motion to suppress.

¶ 23    On September 15, 2023, the State filed a motion *in limine* to admit other bad acts pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011). The motion contended that a confidential source was closely associated with defendant. The source met with defendant and his paramour, Samantha Brown, and defendant disclosed information to the source that connected him to the shooting and the possession of stolen firearms. The State thus requested the court to allow the introduction of evidence of the stolen firearms that police subsequently found in defendant's gold

8

Dodge Stratus. It noted that the gold Dodge Status was regularly used by defendant and believed to be the same vehicle used in the shooting of Campbell. The motion stated the evidence included, but was not limited to, that the Jackson County Sheriff's Office received a report of a stolen gun safe and 14 guns from a residence in Murphysboro. On July 17, 2020, multiple firearms were found in defendant's trunk pursuant to a search warrant. The motion also alleged that on August 13, 2020, its confidential source was informed by defendant how he obtained the firearms and that he had placed them in the gold Dodge Stratus. The motion further argued that the evidence would support the reliability of the witness and facts alleging the vehicle was regularly used by defendant. It contended that the firearm evidence showed a continuing narrative and *modus operandi*.

¶ 24    At the hearing on the motion, the State announced the confidential source had been identified as Brandi Pyatt, who was the mother of defendant's nephew. It continued that, importantly, Pyatt had information that others would not have unless they directly spoke to defendant. The State contended that Pyatt's credibility would be challenged where she was a hired confidential source and the presence of the firearms in defendant's trunk supported her reliability. The State further argued that all the counts were so intertwined that the jury would be left with large gaps if those facts were not presented, where Pyatt heard defendant indicate that he was responsible for the allegations in counts I through IV in addition to the firearms in his trunk. The State further argued that evidence that defendant told Pyatt of the guns in the trunk of the gold Dodge Stratus was also admissible as identification. The State thus requested that limited information be admitted but stated it would not go into the detail of the burglary of the firearms discovered.

¶ 25   Defense counsel argued that Rule 404(b) does not allow other-crimes evidence to bolster a witness's credibility. He further contended the only intertwining of the facts was the mention of firearms, because the guns stolen were not involved in the shooting and vice versa.

¶ 26   The State responded, "[T]his is not about committing the crime and then showing the jury that he's more likely to have shot Farice Campbell because of the guns in his trunk, that's absurd. The idea is to show that he *** at one point possessed firearms." The State indicated that the stolen guns and shooting were so intertwined where it intended to play an overhear, which was an audio-recorded conversation between a confidential source and defendant, in which defendant spoke about both the stolen guns and the shooting in the same night with the same confidential source.

¶ 27   The State also argued that the stolen guns were a way to link defendant to the gold Stratus, stating, "It doesn't do so in a foolproof way, but it certainly ties him closer to that vehicle and that he had an expectation of privacy by putting his gun in those cars, which links him to that gold car." It reiterated that it would not present evidence that the stolen guns were used in the shooting and in fact would present evidence a gun seen by a witness in defendant's home was likely used. The State further argued the jury would be left with the question of whether defendant was driving the gold car on the night of the shooting where defendant claimed it was Brown's car because she was on the title. It further argued that any prejudice would be remedied by a limiting instruction.

¶ 28   Defense counsel argued that evidence of the stolen guns was unnecessary to establish ownership of the car where the co-owner of the vehicle stated defendant drove the vehicle more than she did. The stolen guns were also not dispositive of whether defendant was driving the car the night of the shooting. Defense counsel also contended that the State would not be burdened by telling its witness to exclude the mention of the stolen guns or by editing out any references in the overhear tape.

¶ 29    The court stated while evidence of other crimes and bad acts were inadmissible to show defendant's propensity, such evidence was admissible for any other purpose, including a continuing narrative. It explained that a continuing narrative regards events giving rise to the offense, intertwined with the charged offenses, or explains any aspect of the charged offenses which would otherwise be implausible or inexplicable and require the jury essentially to consider a case, facts, and evidence in a vacuum. It stated, "Clearly given all the facts that we've argued here today, *** this is a situation where it's intertwined ***."

¶ 30    The court then considered whether the prejudicial effect of the evidence substantially outweighed its probative value. It stated, "[T]here is no doubt that any evidence offered is generally probative for the side offering it and prejudicial to the other side." The court held "at this point in time," its prejudicial effect did not outweigh its probative value.

¶ 31    After a short recess, defense counsel stated it wanted to proceed on the motion to sever count III. The State had no objection, and the court granted the motion to sever.

¶ 32    On September 18, 2023, before beginning *voir dire*, the State abandoned the aggravated discharge of a firearm charges in counts V, VI, and VII, and stated it wished to proceed to trial on the attempted first degree murder (counts I), aggravated battery with a firearm (count II), and one count of aggravated discharge of a firearm (count IV) IV. The following day, prior to opening statements, defense counsel continued his objections to the court's rulings on the parties' pretrial motions regarding the Facebook messages, the overhear, and the other-crimes evidence.

¶ 33    At the trial, several law enforcement officials testified for the State. Collectively, the testimonies established that police responded to 202 North 14th Street, Murphysboro, Illinois, on reports of a shooting around 9:55 p.m. on July 15, 2020. It was dark at that time, and a storm had just passed through. Upon arrival, an officer observed a Jeep parked in the parking lot of an

apartment building with the driver's side window shattered and Farice Campbell lying on the ground with his hand wrapped with a cloth. Defects consistent with bullet holes were found in the driver's side door, passenger side window, and the apartment building behind the car. Police also discovered a piece of a human finger on the floorboard of the car. No shell casings were found at the scene, but a fragment of a projectile was found in the passenger seat of Campbell's car. Police concluded a shooting occurred based on the presence of glass on the pavement by the driver's side of the vehicle, blood-like stains on the ground on the driver's side, and the missing driver's side window.

¶ 34    Because there was nothing reported at the intersection where Campbell's apartment was located, police believed a long gun was used instead of a handgun. The scope of the scene was therefore enlarged and the perimeter was moved back. Investigator Lindsay Minckler determined all the bullet defects came from the same direction. Following this trajectory from the crime scene was a Lutheran Church parking lot and even further along that trajectory was the First Christian Church. Surveillance videos from the First Christian Church showed a Dodge Stratus traveling southbound in the alley between 14th Street and 15th Street around the time the shooting took place. When police canvassed the First Christian Church a second time, they were approached by Brenda Vestal, who lived in an apartment north of the Lutheran Church. During the course of this investigation, police discovered a 2000 Dodge Stratus and defendant—who went by the name "Security"—may have been involved.

¶ 35    Brenda Vestal testified that she lived at 200 North 15th Street in Murphysboro, Illinois, since January 2018. In July 2020, she owned a 2011 gold GMC Terrain, which she parked in front of the Lutheran Church. She testified that she would leave for work between 9:30 and 9:45 every night. Vestal testified that she remembered July 15, 2020, because a storm occurred. She left closer

12

to 9:45 p.m. that night. On the way to her car, she noticed a vehicle that she knew did not belong to any of the surrounding tenants. The vehicle was running and the headlights were on. Vestal did not get the license plate at that time but could tell the car was a Dodge Stratus by the taillights. Vestal explained she belonged to a family of mechanics. She could not see anyone in the vehicle because the windows were tinted but noticed the color of the vehicle was either silver or gold.

¶ 36    On cross-examination, Vestal admitted the first time she spoke to the police, she believed she saw a Dodge Intrepid and later realized it was a Dodge Stratus when she later saw the same type of vehicle while driving. She also admitted the first time she spoke with officers she told them the vehicle was silver and later told them it might have been gold.

¶ 37    Nicholas McRoberts testified that on the night of July 15, 2020, around 9 or 10 p.m., he and Jolene Caraker left his house in his black Dodge Challenger and headed to Circle K to get a drink and go out to drink with friends that night. They left Circle K on 14th Street and headed towards Main Street. As he came to the four-way stop on Manning Street, McRoberts heard what sounded like firecrackers. He observed an individual hanging out of a silver Jeep screaming for help. McRoberts drove closer and saw what looked like bullet holes and shattered glass. After he parked, he ran to the man in the Jeep and a woman gave McRoberts a towel to wrap up the man's hand. Then, he called 911. McRoberts testified that no one else was around besides him, Jolene, and the man in the Jeep. He stated that Jolene seemed pretty scared and stayed in the car the entire time. He was not sure if law enforcement spoke to her that night.

¶ 38    The State also admitted, as State exhibit No. 14, a copy of a letter from defendant to Samantha Brown that defendant wrote while jailed. In the letter, defendant instructed Brown to make an anonymous tip to Crime Stoppers and attached a separate document for her to read. Defendant further instructed Brown to complete an affidavit using the language he provided and

13

explained to Brown the importance of an affidavit. The attached document stated that on July 15, 2020, around 9:30 p.m., she was walking by a nearby building when she heard loud pops that sounded like gunshots. It then stated that she observed a while male, about six foot tall, with a rifle in his hand, near the parking lot of the apartment building. The male looked around before getting into a black Challenger and driving off. She then heard a black male yelling for help. The document also stated, "I recently heard that a man named Security was being held for the shooting. I know for a fact that it couldn't have been Security because I seen a white guy not a black guy." It further stated she initially said nothing because she wanted nothing to do with it.

¶ 39    In the letter, defendant also instructs Brown to have a man referred to as "Money" to complete another affidavit that defendant attached to the letter, as well as have "Brock" sign an affidavit. The letter further stated, "The lawyer don't need to know that you and [M]oney are together." Subsequently, the letter said, "If you have a problem getting the papers signed[,] have random people sign them. As long as their [*sic*] signed."

¶ 40    The attached affidavit for Money stated that he saw Security outside around 10 p.m. and Security asked him for a ride to his house on Gartside. The document further stated that when he arrived at Security's house, Security started to complain about his fiancée having his car.

¶ 41    Also attached was a document listing the "key points" that defendant wanted Brown to discuss with his lawyer. The list included that (1) Chris had his car Wednesday July 15, 2020, through Friday, (2) Brock gave him a ride to Micah's on Wednesday night and Money brought him home, and (3) defendant had trouble walking due to his bad back.

¶ 42    Farice Campbell testified that on July 15, 2020, he was shot. At that time, he lived at 202 North 14th Street, Apt. 1, Murphysboro, Illinois, and rented a cheap Jeep Cherokee Trail Hawk. The building was near the corner of 14th Street and Manning Street. He remembered there were

14

aggressive storms to the point that sirens were alarmed. Around 8:30 or 9 p.m., Campbell left his apartment to go to the Circle K gas station off North 14th Street. As he sat in his car in the apartment parking lot for a few minutes while preparing to leave, he was shot. He did not realize what happened and just saw flashing lights and windows shattering. He then realized he was shot in his left hand and saw a lot of blood. Campbell crawled out of his car and hollered for assistance. He testified a man he did not know at the time named McRoberts helped him. Afterwards more neighbors came out and police and ambulance arrived. Campbell did not see anyone shoot or run away.

¶ 43     Campbell testified that at the time he could not think of anyone who would want to shoot him. Eventually, he provided the name of Jolene Caraker, whom he met in November or December of 2019. They eventually started an intimate relationship in February 2020. On July 15, 2020, the relationship was not in a good space, and he was doing his best to transition away from her. Campbell testified they would make verbal jabs at each other and he had her remove her things from his apartment.

¶ 44     He further stated things started to get heated a few days before he was shot. On July 13, 2020, he took some items, like a television and a couple of other things, to Jolene's residence and left them on her porch. He then sent her a message to let her know he left things at her residence. Campbell testified they exchanged texts, both acting unkindly. On July 14, 2020, when Campbell returned home from work, Jolene pulled in immediately behind him. They began arguing over the remote control to a television and a pair of boots that she left at his apartment. On July 14, 2020, she showed up asking for more items. Campbell testified that Jolene drove a maroon Dodge Caravan and a man he knew by the name "Security" was in the passenger side of Jolene's Caravan. He then identified defendant as Security. Campbell stated that defendant stepped out of the car

15

while eating out of a bowl but remained on the sidewalk during the entire interaction. Campbell testified that, at the time, he knew of defendant but did not know him personally. Campbell admitted he was not cordial to Jolene that day and said things to both Jolene and defendant. Campbell told them to get away from his house and to leave him alone. Defendant said a couple words back, got in the car, and left.

¶ 45    Campbell testified that later in the night on July 14, 2020, he texted Jolene and agreed he mentioned defendant. Campbell admitted to sending a message threatening to get Jolene fired from her job. He further agreed Jolene was not the only person he was in a relationship with at the time, but none of his breakups with the other individuals ended the way that Jolene's breakup ended. He also agreed that he did not believe Jolene and defendant were in a relationship. Campbell stated that defendant did not threaten him, but he assumed defendant was upset based on the words exchanged.

¶ 46    Campbell testified his injuries included broken bones and missing ligaments. After a couple of weeks of trying to save his hand, his pinky was amputated. He also had rods and pins in place of bones, ligaments, and joints. He estimated he had about 50% use of his left hand.

¶ 47    Prior to testimony regarding the overhear, defense counsel relodged his continuing objection. Sergeant Cory Etherton of the Murphysboro Police Department testified that he became the lead detective involved with this case on July 15, 2020. After discovering, through investigation, that the potential suspect drove a gold Dodge Stratus and police suspected defendant's involvement, he drove to defendant's residence with Samantha Brown and located a gold Dodge Stratus. The vehicle had damage to the passenger mirror. The police then reviewed the church's video surveillance, slowed the video down to create still images, and were able to see the outside passenger mirror of the suspect vehicle had similar damage to defendant's vehicle.

Upon this information, the police obtained a search warrant for defendant's vehicle. Sergeant Etherton testified that he, and other police, executed the search warrant.

¶ 48　Sergeant Etherton testified to Campbell's disclosure to officers of his text messages with Caraker, in which Campbell called defendant a derogatory name. The State then asked Sergeant Etherton if he sometimes used social media as a tool in his job. Sergeant Etherton answered affirmatively, stating Facebook Messenger tended to be the biggest thing to be utilized as it was a way of communicating. Sergeant Etherton further testified that police conducted an open source search, where an officer went to www.facebook.com and used the simple search bar at the top of the page. They searched Facebook for Jolene Caraker and defendant. They were able to locate related profiles, were granted a search warrant for those accounts, and obtained the records from Facebook.

¶ 49　Sergeant Etherton identified State exhibit No. 20B as the DVR containing the information received from Facebook. Defense counsel continued his objection to the exhibit. Sergeant Etherton also identified State exhibit No. 21A as numerous pages from the Facebook account related to defendant, which included a Facebook Messenger conversation between him and Caraker. Defense counsel again made a continuing objection.

¶ 50　Of relevance, Sergeant Etherton found a conversation between defendant and Caraker. Caraker sent defendant a screenshot of a text message thread between her and Campbell. The screenshotted thread reveals Campbell called defendant a derogatory name. Defendant replied to Caraker with a message directing her to tell Campbell that he would know why people called defendant Security. Sergeant Etherton further testified that roughly an hour or two before the shooting, defendant had another conversation with Caraker, in which he asked about the apartment building that Campbell lived in. Sergeant Etherton also testified that defendant messaged and

17

asked whether "he lived upstairs or downstairs," which Sergeant Etherton took as where Campbell lived. Defendant also asked if there were any cameras. Sergeant Etherton testified they were not able to interview Jolene Caraker until recently, as police were not able to locate her at the time of the offense.

¶ 51    He then testified that he conducted an interview of defendant on August 14, 2020, that was audio- and video-recorded. Sergeant Etherton further testified that during his interview of defendant, defendant put himself in sole possession of the gold Dodge Stratus during the time of the shooting. Sergeant Etherton identified State exhibit No. 23 as the August 14, 2020, recorded interview of defendant. Defense counsel continued his objection.

¶ 52    In the interview, defendant confirmed that he lived at 1912 Gartside Street, Murphysboro, Illinois. He stated he purchased the gold Dodge Stratus, but he and Samantha Brown were co-owners of the vehicle. Defendant further indicated that he drove the vehicle often. Police questioned defendant about the firearms found in his trunk. Defendant described Jolene Caraker as an acquaintance. He said that he went with Caraker to Campbell's apartment to get her property back. He further stated that he had not heard about anything happening to Campbell.

¶ 53    Defendant put himself driving the Dodge Stratus on the night of the shooting in Murphysboro at approximately 9 p.m., which was when defendant stated he left his house to go to the house of his friend Micah's grandmother to eat dinner with Micah's family. Defendant said he traveled southbound on 19th Street into Valley Ridge housing projects. Defendant advised that Micah, his grandmother, and an unknown female with two unknown children were present. They all ate dinner and hung out until about 10 or 10:30 p.m. when defendant returned home traveling the exact same route in reverse.

18

¶ 54    Sergeant Etherton testified that after defendant's interview, he met Micah and Micah's grandmother, Elizabeth Welch. Defendant's story was not corroborated.

¶ 55    The State then asked, "Based on your interview with [defendant], *** and along with other factors of course, who do you determine was in possession of the gold Dodge Stratus on July 15 in Murphysboro?" Sergeant Etherton answered, defendant. Sergeant Etherton also testified during the first overhear, defendant stated that he knew about the injuries to Campbell and provided great detail.

¶ 56    During defendant's interview, police also questioned him about the guns found in the trunk of the Dodge Stratus. Defendant stated that firearms were not his "M-O." The State then had Sergeant Etherton identify State exhibit Nos. 12I and 12J, which were pictures that police took when executing the search warrant on the gold Dodge Stratus. State exhibit No. 12I showed a green bag full of what appeared to be several long-arm firearms in the trunk of the vehicle. State exhibit No. 12J displayed 11 long-arm firearms lying on the floor with the empty green bag. Defense counsel continued his objection.

¶ 57    Sergeant Etherton testified there were several items in the trunk of the car, but the focus was on a green Army-style duffel bag that contained multiple firearms. He stated that during the course of his investigation, it was believed that the firearm that shot Campbell would have been a .223 caliber or higher than a large caliber rifle. Because none of the firearms found in defendant's trunk were of that caliber, Sergeant Etherton did not believe any of the firearms found in defendant's trunk were used to shoot Campbell. The State then asked, "After reviewing the investigation in its entirety did you come to a conclusion about who was in possession and driving the gold Dodge Stratus on July 15, 2020, between 9 and 10:15 p.m." Sergeant Etherton again answered, defendant.

¶ 58 On cross-examination, Sergeant Etherton testified that in his interview, defendant stated that if he went anywhere else, it would have been to a Huck's gas station. Sergeant Etherton stated that police attempted to obtain video surveillance from Huck's but were unsuccessful. He then confirmed that none of the guns found in the car were used in this shooting. Sergeant Etherton further stated police were unable to locate the firearm that shot Campbell, and that Campbell was never mentioned in the Facebook messages between Caraker and defendant.

¶ 59 Elizabeth Welch testified that she was the grandmother of Micah Jones and lived in Murphysboro. She vaguely remembered officers coming to her house in July 2020 to ask her about someone being at her house. Welch testified that she usually ate dinner between 5 and 6 p.m. and never ate dinner at 8:30 or 9 p.m. She further testified that she had no one at her house for dinner at 8:30 or 9 p.m. Although she could not remember the date, Welch stated that she told defendant that she would cook if he and his family came by. A few days later, Welch, Jones, Jones's daughters, and defendant came over while it was still daytime to eat.

¶ 60 Jolene Caraker testified that she met Campbell at her job at a liquor store. After about a month, Campbell offered her a safe place to stay at his apartment while she was in a bad relationship with her ex-boyfriend. Campbell and Caraker's relationship became intimate. In May or June 2020, they had a falling out because Caraker was not comfortable with Campbell's drinking given her history of abusive relationships.

¶ 61 Caraker stated that she knew defendant as "Security." Defendant was the friend of Caraker's abusive ex-boyfriend. Defendant helped Caraker get away from her ex-boyfriend, so she asked defendant to go with her to Campbell's apartment to get her things. While unsure of the date, Caraker remembered Campbell put her TV in her yard but not the rest of her personal items that were still at his apartment. When she asked to get the rest, Campbell refused and threatened her.

Caraker stated the following day, she messaged Campbell again so she could retrieve her things, but Campbell "was going back and forth with his hateful messages." So, she asked defendant to ride with her to Campbell's apartment to retrieve her things. She stated Campbell screamed the entire time and called both her and defendant hateful names. Caraker testified she never got out of the car and eventually left without her personal items.

¶ 62 Caraker identified State exhibit No. 3 as a text message conversation between her and Campbell. In the text conversation, Campbell threatened to call Caraker's employer in an attempt to get her into trouble. Campbell also called defendant a derogatory name. Caraker admitted that she screenshotted her text message conversation with Campbell and sent it to defendant.

¶ 63 Caraker also identified State exhibit No. 21B as the Facebook Messenger conversation between her and defendant, in which she sent the photo of her conversation with Campbell and told defendant she did not know what to do. Defendant replied, "do nothing. Text that number back. He didn't say anything to me about being a b***." Caraker indicated that she was afraid she would lose her job. Defendant responded, "You'll see why they call him Security. Copy and send." Caraker testified she believed that message meant that defendant wanted her to send "You'll see why they call him Security" to Campbell. When Caraker again told defendant that she was afraid, defendant messaged, "Don't talk about [it] no more. Do what I told you to do." The State then asked Caraker if she knew the meaning of defendant's message that said, "He stays upstairs or downstairs in the right apartment." Caraker testified that she thought defendant wanted to know where Campbell lived. Caraker told defendant that Campbell lived upstairs, and defendant asked how many stairs. Caraker responded, "Just the one. Those stairs you saw last night. His is the door at the top of the stairs." Caraker testified that she did not want Campbell to be shot.

¶ 64    Caraker further testified that on the evening of July 15, 2020, she was driving with Nick McRoberts near Campbell's apartment when she heard gunshots. She did not see anyone shooting the gun or anyone running away from the area. Caraker stated she never got out of the car while McRoberts helped Campbell because she figured she was the last person Campbell would want to help. She said despite seeing Campbell shot, she did not initially speak to police because she was afraid Campbell would think she had something to do with it.

¶ 65    Brandi Pyatt testified that she had a child with defendant's brother. In July 2020, Pyatt and defendant were close and their families would hang out together. Pyatt admitted to previously being in trouble with the law involving drugs and working with law enforcement as a confidential source. Pyatt testified that she worked as a confidential source for pay around five times. Police contacted her and requested she get in contact with defendant and find his whereabouts. The conditions of the pay were that she make contact with defendant and get him out of the house so police could make his arrest.

¶ 66    Pyatt testified that on August 12, 2020, defendant originally told her about the shooting. Specifically, defendant told Pyatt that he received a screenshot from Caraker in which Campbell called defendant a derogatory name. Defendant continued to tell Pyatt that he told Caraker not to worry and later in that evening—during a storm—he went and parked at the church on 15th Street. Defendant also told Pyatt that "when [Campbell] came outside and the thunder cracked, he cracked."

¶ 67    Pyatt testified that the first overhear occurred on August 13, 2020. At that time, defendant's car had already been towed. She stated that during this overhear, defendant said the police illegally searched the Dodge Stratus because it was not his car but was Brown's car. Defendant further said to Pyatt that "the only reason they came and was looking for the car was because of another

22

incident that happened in Valley Ridge Apartments where the resident had gave the description of him and his car and that's why" they were looking for the car. Pyatt testified that defendant drove the gold car and Brown drove a black car.

¶ 68    Pyatt also stated that during the overhear, defendant thought he had blown off Campbell's arm. When Caraker told him that Campbell had fingers left, defendant said that next time he would shoot them off one-by-one. He further stated that after the police took the car, he instructed his brother to remove all the firearms and ammo in the house. Pyatt testified that defendant told her that he shot Campbell because Campbell called defendant a derogatory name. Defendant also reenacted Campbell's screams.

¶ 69    Pyatt identified State exhibit No. 16 as the two overhears she participated in. Defense counsel continued his objection. The overhear was played for the jury.

¶ 70    Samantha Brown testified that defendant was the father of her son and they lived together at 1912 Gartside Street in July 2020. At that time, she had a silver Infiniti G35x and defendant had a gold Dodge Stratus. Brown testified that the same day as, but prior to, the police search of the Dodge Stratus, defendant left in the Infiniti and left the Dodge Stratus at home. Micah eventually brought the Infiniti back to Brown. Once she informed defendant that the police took the Dodge Stratus, defendant told Brown that he was not coming back home. About a month later, in August 2020, defendant returned to see his nephew, who recently returned to Pyatt's care. At the time of the search warrant, Brown was not aware of the shooting and on July 15, 2020, she believed defendant left to go to the gas station.

¶ 71    The State rested, and defendant motioned for a directed verdict on all charges. After hearing arguments, the court denied defendant's motion for a directed verdict. The defense rested without presenting evidence.

¶ 72    During closing arguments, the State said, *inter alia*:

"Last thing I want to leave you with are the witnesses, real quick. Farice Campbell no angel, but he's honest, he sat and told the truth. It wasn't great for him, but he did. I believe him. \*\*\* Caraker was all over the place. But I believe Farice Campbell.

Jolene Caraker is interesting. She took the stand and had trouble with it because she, it seemed, based on her testimony, that she felt responsible in some way. She had a tough time. But you get to decide if you believe her testimony. I believe it. She wanted to get back at Campbell. She didn't want to get fired. She sent that message to Security. What she was expecting Security to do, I have no idea, but he did something, he shot Farice Campbell."

The State later stated that the jury could choose or judge the credibility of the witnesses and the proper weight they deserved.

¶ 73    In the defense's closing argument, counsel stated:

"[I]t has to be proven beyond a reasonable doubt that it was the defendant. Not assume, not inferred. Not, well, that's close enough. The highest burden is what you are tasked with, it's what the State is tasked with, beyond a reasonable doubt, that the defendant, not anyone else, the defendant did this."

Defense counsel pointed out the absence of any witness testifying to seeing defendant shoot Campbell. Counsel further stated, "[I]t's not your job to fill in the blanks, to put the pieces together, to assume."

¶ 74    In its rebuttal, the State said:

"You can have some questions. This is not beyond all doubt and the burden for you is not beyond all doubt, no questions, it's beyond a reasonable doubt. There is a difference. There is a huge difference. You can have questions and you can use circumstantial evidence and you can use your common sense and experiences to come to your verdict."

¶ 75    Later in the rebuttal, the State reiterated:

"But the evidence is there. A lot of questions. There is going to be some that are left over that we'll never know. That's true for a lot of cases, there is going to be questions that we can't answer, we're never going to answer, but that doesn't mean the [defendant] didn't shoot Farice Campbell that night. Where is the gun. We'll never know. There was testimony about what happened to the gun. *** I have to prove this verdict beyond a reasonable doubt, not all doubt."

¶ 76    After deliberation, the jury found defendant guilty of all charges. The jury also found defendant personally discharged a firearm that inflicted severe bodily injury and proximately caused great bodily harm to another person.

¶ 77    On October 23, 2023, counsel filed a motion to vacate, or in the alternative motion for new trial. The motion argued, *inter alia*, that the court erred in denying defendant's motions to suppress and admitting the evidence listed in those motions, and the evidence was insufficient for all charges. The motion also argued that the court erred in admitting several of the State's exhibits, including those regarding the firearms found in defendant's trunk.

¶ 78    On June 13, 2024, the court addressed the posttrial motions. Neither party provided further argument, and the court denied all of defendant's posttrial motions. Defense counsel then averred that it was his understanding the State would be moving to dismiss the aggravated possession of a

stolen firearm in count III, and would proceed only the unlawful use of a weapon by a felon charge in count VIII.

¶ 79    In relation to the trial of the unlawful use of the weapon by a felon charge, the parties filed the stipulated facts. They agreed the evidence that would be presented was substantially the same as the trial on the other charges, and defense counsel would make the same objections as in the prior trial. As such, the parties requested the court take judicial notice of the transcripts of the prior trial. The parties additionally stipulated that defendant had previously been convicted of a felony. The court stated it had considered the stipulated evidence and found defendant guilty of unlawful use of a weapon by a felon. The court dismissed count III.

¶ 80    The matter then proceeded to sentencing. Campbell provided a victim impact statement, and defendant provided a statement in allocution. After addressing the statutory factors in aggravation and mitigation, the court merged the aggravated discharge of a firearm and aggravated battery with a firearm into the attempted first degree murder conviction. It then sentenced defendant to 6 years' imprisonment for attempted first degree murder to run consecutively to the 25-year mandatory firearm enhancement, for a total of 31 years on that charge, and a concurrent 10-year sentence for unlawful use of a weapon by a felon.

¶ 81                                    II. ANALYSIS

¶ 82    On appeal, defendant asserts his attempted first degree murder and aggravated discharge of a firearm convictions violated his statutory speedy-trial rights, the State provided insufficient evidence of defendant's intent to kill, the court erred in denying defendant's motion to suppress his Facebook messages, the court improperly allowed other-crimes evidence, and the State made several errors that deprived defendant of a fair trial. We agree with defendant as to the first issue but reject his remaining claims.

26

¶ 83                    A. Speedy-Trial Violation

¶ 84    Defendant first contends the attempted first degree murder and aggravated discharge of a firearm charges were brought well after the expired speedy-trial period. To preserve the issue, defense counsel was required to move to dismiss the charge before trial or within a reasonable time following arraignment. 725 ILCS 5/114-1(b) (West 2020) ("The court shall require any motion to dismiss to be filed within a reasonable time after the defendant has been arraigned."); *People v. Pearson*, 88 Ill. 2d 210, 219 (1981) (speedy-trial issue must be brought to the court's attention before trial and not in a posttrial motion); see also *People v. Staake*, 2017 IL 121755, ¶ 30 (under section 114-1, a defendant who fails to file a pretrial motion to dismiss based on statutory speedy-trial grounds is considered to have waived those grounds). Defense counsel did not do so here and therefore the issue is waived. Defendant, however, asserts that defense counsel's failure to file a motion to dismiss the attempted first degree murder and aggravated discharge of a firearm charges based on speedy-trial principles was ineffective assistance of counsel.

¶ 85    A criminal defendant has a constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504 (1984) (Illinois Supreme Court adopting the *Strickland* standard). To prevail, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and counsel's errors resulted in prejudice. *People v. Bailey*, 2020 IL App (5th) 160458, ¶ 86. "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Cathey*, 2012 IL 111746, ¶ 23 (quoting *Strickland*, 466

27

U.S. at 694). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *People v. Erickson*, 183 Ill. 2d 213, 224 (1998) (quoting *Strickland*, 466 U.S. at 694).

¶ 86    Turning to the first prong of *Strickland*, to decide whether counsel's actions in this respect were objectively reasonable, we must first decide whether defendant's speedy-trial rights were violated. A defendant possesses both a constitutional and statutory right to a speedy trial. *People v. Gooden*, 189 Ill. 2d 209, 216 (2000). Defendant here limits his argument to the statutory right to a speedy trial.

¶ 87    The speedy-trial statute provides, "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant *** ." 725 ILCS 5/103-5(a) (West 2020). "A defendant not tried within the statutory period must be released from his trial obligations and have the charges dismissed." *People v. Hunter*, 2013 IL 114100, ¶ 10 (citing 725 ILCS 5/103-5(d), 114-1(a)(1) (West 2008); *People v. Woodrum*, 223 Ill. 2d 286, 299 (2006)). When a case involves multiple, factually related offenses charged at different times, the speedy-trial statute is tempered by compulsory joinder principles. *People v. Williams*, 204 Ill. 2d 191, 198 (2003).

¶ 88    The compulsory joinder statute requires all charges—based on the same act—to be prosecuted in a single prosecution if the offenses were known to the prosecution and are within the jurisdiction of the same court. 720 ILCS 5/3-3(b) (West 2020). The Illinois Supreme Court has explained that all charges subject to compulsory joinder are subject to the same speedy-trial period. *People v. Quigley*, 183 Ill. 2d 1, 13 (1998). As such, the speedy-trial period begins for all charges subject to compulsory joinder once the speedy-trial demand is filed, even if the State files additional charges at a later time. *Id.* The issue of whether compulsory joinder applies is a legal question that is reviewed *de novo*. *People v. Dismuke*, 2013 IL App (2d) 120925, ¶ 10.

28

¶ 89    Defendant's speedy-trial rights began on August 14, 2020, when he was arrested. He was not charged with attempted first degree murder and aggravated discharge of a firearm until March 3, 2021, which was 202 days from the start of his speedy-trial calculation on the original charges. Two and one-half years later, after several more continuances that are not challenged here, defendant's jury trial began on September 18, 2023. We must thus decide whether the subsequent charges were subject to compulsory joinder.

¶ 90    Defendant argues that because the subsequent attempted first degree murder and aggravated discharge of a firearm charges occurred at the same time, at the same place, and involved the same facts as the original charges, all charges were subject to compulsory joinder and had the same speedy-trial period. He further contends under the *Williams* rule, any delays or continuances attributable to defendant on the original charges were not attributable to him for the subsequent attempted first degree murder and aggravated discharge of a firearm charges. *Williams*, 204 Ill. 2d at 207.

¶ 91    Citing *People v. Hayes*, 2025 IL App (4th) 240149-U, ¶ 23, the State argues that the original information put defendant on notice the State intended to hold him accountable for the shooting and injury of Campbell and that he should prepare his defense related to his conduct in shooting Campbell. The newer charges did not reflect a change in the facts or possible theories of defense. It contends, therefore, that the second amended information did not prejudice defendant. *Id.* It further asserts defendant should not be heard to complain that the filing of the second amended information resulted in a "trial by ambush" after a 2½-year gap between the filing of the second amended information and the jury trial. *Id.* The State's arguments are not well-taken.

¶ 92    In *Hayes*, the defendant was initially charged with felony murder of Sheena Malone as well as with three other firearm-related charges. *Id.* ¶ 5. Over a year and a half later, the State charged

29

him with two additional counts of first degree murder of Sheena Malone under the theories of intentional murder and knowing murder. *Id.* ¶ 6. The appellate court found that the subsequent murder counts were not "new and additional" because the defendant at all times knew he would have to defend against the charge of first degree murder. *Id.* ¶ 22. It relied on the legal principle that one offense of murder exists even though it may be committed in numerous ways. *Id.* ¶ 21. "The original indictments put defendant on notice the State intended to hold him accountable for the death of Malone and he should prepare his defense related to his conduct in shooting her." *Id.* ¶ 23.

¶ 93    A critical component of the *Hayes* decision was the defendant was charged with the exact same offense of the same person, albeit under a different theory. Thus, the *Hayes* defendant at all times knew he had to defend against a first degree murder charge. Here, defendant was not subsequently charged with the same offense under a different theory; he was charged with two additional offenses. Accordingly, *Hayes* is distinguishable.

¶ 94    We find this case is similar to *People v. Sandlin*, 2021 IL App (5th) 190120-U, ¶ 4, where the defendant was arrested on May 16, 2017, and on May 24, 2017, was charged with aggravated discharge of a firearm, aggravated domestic battery, and unlawful use of a weapon by a felon. On November 6, 2017, the State filed an amended information charging the defendant with attempted first degree murder in addition to the original charges. *Id.* ¶ 9. This court found that at the time the defendant was initially charged on May 24, 2017, the State knew all of the facts surrounding the incident, as both offenses arose from the single incident of shooting of one victim. *Id.* ¶ 39. With regard to whether the attempted first degree murder charge was new and additional, the court stated the new charges alleged a greater class felony, a much greater sentencing range, and "required proof of different elements." *Id.* ¶ 42. It specifically noted the additional element of a substantial

30

step toward the commission of first degree murder with intent to kill. *Id.* This court rejected the argument that *Williams* is inapplicable if "the original information gave defendant adequate notice of the subsequent charge to prepare his defense," and clarified that the *Sandlin* case did not concern late-filed charges that were identical offenses. *Sandlin*, 2021 IL App (5th) 190120-U, ¶¶ 40-42. It further noted that the new charge in that case was not a lesser-included or lesser-mitigated offense of the other. *Id.* ¶ 42. *Sandlin* thus concluded "the subsequent charge was new and additional for speedy-trial purposes." *Id.*

¶ 95    Similarly here, it is undisputed that the subsequent charges were based on the same act as the original charges and known to the State at the time of the original charges. The original charge here of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2020)) and subsequent charges of attempted first degree murder and aggravated discharge of a firearm are also similar to that in *Sandlin*.

¶ 96    We find *Sandlin* persuasive and for the reasons stated therein and that defendant's attempted first degree murder and aggravated discharge of a firearm were new and additional for the purposes of compulsory joinder. As further noted in *Sandlin* and argued by defendant, because compulsory joinder applied to the subsequent charges, the *Williams* rule is applicable and held any delays attributable to defendant on the original charges were not attributable to him on the subsequent charge. *Sandlin*, 2021 IL App (5th) 190120-U, ¶ 42; see also *Williams*, 204 Ill. 2d at 207 ("If the initial and subsequent charges filed against the defendant are subject to compulsory joinder, delays attributable to the defendant on the initial charges are not attributable to the defendant on the subsequent charges.").

¶ 97    The State contends *Sandlin* is distinguishable because the Illinois Supreme Court orders—based on the COVID-19 pandemic—effectively halted or paused the applicable 120-day statutory

31

speedy-trial limitation between the time that the original charges were filed and when the subsequent charges were filed. See Ill. S. Ct., M.R. 30370 (eff. Apr. 7, 2020). The State further argues, "[A]s the statutory limitation period is not utilized to calculate defendant's speedy trial on his original charges, how can the same suspended statutory limitations period be used to decide whether the filing of new and additional charges violated speedy trial under compulsory joinder?" Stated another way, if no speedy-trial clock is running for any charge, then the *Williams* rule does not apply because the new charge could not, nor would not, be capable of violating speedy trial.

¶ 98     We find the State's question is based on an incorrect premise and misconstrues the Illinois Supreme Court orders concerning the COVID-19 pandemic and speedy-trial calculations. While speedy-trial calculations are implicated in the *Williams* rule, the application of the rule is dependent on whether the offenses are subject to compulsory joinder. *People v. Phipps*, 238 Ill. 2d 54, 67 (2010). The orders speak to nothing of the compulsory joinder statute or whether the State is excused from timely filing uncharged conduct. Further the orders state that the court "may continue trials" and that any delay is not attributable to either party for the purposes of the statutory speedy-trial calculation. We do not take the court's allowance regarding "trials" to mean "uncharged conduct."

¶ 99     The orders in effect at the time of defendant's original filing allowed each circuit to return to hearing court matters but provided the chief judge in each circuit with discretion on how to do so safely and reiterated "trial continuances are excluded from speedy trial computations." *People v. Ballard*, 2022 IL App (1st) 210762, ¶ 35 (citing Ill. S. Ct., M.R. 30370 (eff. June 1, 2020)). The order effective in June 2020 stated that the court "may continue trials" and that "such continuances shall be excluded from speedy trial computations contained in section 103-5 of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-5 (West 2018)) ***." Ill. S. Ct., M.R. 30370 (eff.

32

June 1, 2020). This portion of the order remained in effect until October 1, 2021. See Ill. S. Ct., M.R. 30370 (eff. Oct. 1, 2021). Thus, the State is incorrect to frame the order as if it automatically suspended the speedy-trial statute in its entirety, as it only afforded the lower courts discretion to continue cases and required any delay resulting from this emergency continuance order shall not be attributable to either the State or the defendant for purposes of the statutory speedy-trial calculation. See *Ballard*, 2022 IL App (1st) 210762, ¶ 35.

¶ 100    Now viewing the emergency orders through the correct lens, there is clear fault in the State's framing of the issue as whether the subsequent charges violate the speedy-trial statute when the speedy-trial statute did not apply to the original charges. As just discussed, the speedy-trial statute did apply, but the lower court was free to continue the case without attributing the delay to either party. The proper question is thus whether the subsequent charges violated the speedy-trial statute when the original charges were properly continued at no fault of either party.

¶ 101    The answer to that question is yes, because the later-filed charges were not before the court when the case was continued, which is an underlying reason for the *Williams* rule. As stated in *Phipps*, 238 Ill. 2d at 66, "Continuances obtained in connection with the trial of the original charges cannot be attributed to defendants with respect to the new and additional charges because these new and additional charges were not before the court when those continuances were obtained." Indeed, the lower court did not have jurisdiction over those offenses until the charges were filed. *People v. Sharifpour*, 402 Ill. App. 3d 100, 121 (2010) ("the trial court obtained subject matter jurisdiction when the State created a justiciable controversy by filing criminal charges against the defendant with the court"); *People v. Ewing*, 2023 IL App (5th) 200003-U, ¶ 30. So, while the State is correct in that one purpose of the *Williams* rule is to avoid trial by ambush (*Phipps*, 238

33

Ill. 2d at 67), there could have been no way to continue the statutory speedy-trial right regarding the subsequent charges until they were actually filed.

¶ 102   Accordingly, where the Illinois Supreme Court emergency orders failed to speak to compulsory joinder and the State failed to provide any authority endorsing an exception to the *Williams* rule, we follow the binding authority requiring application of the rule when offenses are subject to compulsory joinder.

¶ 103   As noted above, 202 days elapsed from when the original charges were filed and until the additional charges subjected to compulsory joinder were filed. Under *Williams*, no continuance prior to March 3, 2021, can be attributed to the attempted first degree murder and aggravated discharge of a firearm charges. As such, the speedy-trial calculation was at 202 days on the new charges when they were filed and any trial on those charges would have been in violation of defendant's statutory speedy-trial rights.

¶ 104   Counsel has been held to be ineffective when a violation of a defendant's speedy-trial rights is apparent from the record. *People v. Alcazar*, 173 Ill. App. 3d 344, 354-55 (1988) (counsel ineffective for failing to seek defendant's discharge on speedy-trial grounds, and accordingly reversing defendant's conviction obtained in violation of his speedy-trial right); *People v. Staten*, 159 Ill. 2d 419, 431 (1994); *People v. Boyd*, 363 Ill. App. 3d 1027, 1038 (2006) ("defense counsel's failure to invoke defendant's speedy-trial rights cannot be justified as a matter of trial strategy"). Indeed, *Sandlin* also found counsel was ineffective for failing to move to dismiss based on the speedy-trial violation in that case. *Sandlin*, 2021 IL App (5th) 190120-U, ¶ 43.

¶ 105   We further agree with defendant that counsel's inaction prejudiced him because he would have escaped two of the most serious charges he faced had counsel filed a motion to dismiss the attempted first degree murder and aggravated discharge of a firearm charges. *Boyd*, 363 Ill. App.

34

3d at 1038-39 (finding attorney ineffective where she allowed her client to stand trial on a count that could have been discharged on speedy-trial grounds); see also *Alcazar*, 173 Ill. App. 3d at 354-55 (counsel ineffective for failing to seek defendant's discharge on speedy-trial grounds, and accordingly reversing defendant's conviction obtained in violation of his speedy-trial right); *Sandlin*, 2021 IL App (5th) 190120-U, ¶ 43. Accordingly, we find trial counsel was ineffective by failing to file a motion to dismiss the attempted first degree murder and aggravated discharge of a firearm charges based on a violation of defendant's speedy-trial rights. We therefore vacate defendant's attempted first degree murder and aggravated discharge of a firearm charges. Because of this ruling, we also remand the case so that the trial court may resentence defendant based on the remaining charges that he was found guilty. See *Sandlin*, 2021 IL App (5th) 190120-U, ¶¶ 43, 53.

¶ 106                    B. Denial of Motion to Suppress

¶ 107   Defendant also argues that the totality of the circumstances here shows that there was an insufficient nexus between the shooting of Farice Campbell and his Facebook messages such that the court erred in denying his motion *in limine*. The State argues the denial was appropriate, or alternatively, the evidence should nevertheless not be excluded under the inevitable-discovery doctrine and the good-faith exception. The State further argues any error was harmless.

¶ 108   A ruling on a motion to suppress is subject to a mixed standard of review. *People v. Woods*, 2019 IL App (5th) 180336, ¶ 27. We give great deference to the trial court's findings of fact and review its factual findings to determine whether they are against the manifest weight of the evidence. *Id.* Nevertheless, we review the trial court's ultimate legal ruling as to whether suppression is warranted *de novo*. *Id.*

¶ 109   Both the United States and Illinois Constitutions protect the right of citizens to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amends. IV, XIV; see Ill. Const. 1970, art. I, § 6. Our analysis under either constitution is the same. See *People v. Manzo*, 2018 IL 122761, ¶ 28. "Pursuant to federal and state warrant requirements, a detached judicial officer must resolve the question of whether probable cause exists to justify issuing a warrant." *Id.* ¶ 29.

¶ 110   The rules for probable cause are well settled. Probable cause to issue a search warrant will exist if the facts set forth in an affidavit would cause a reasonable person to believe a crime has been committed and evidence of that crime is located in the place to be searched. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *People v. Sutherland*, 223 Ill. 2d 187, 219 (2006).

¶ 111   Regardless of whether an individual is validly suspected of committing a crime, an application for a search warrant concerning his property or possessions must demonstrate reasonable cause to believe that evidence is likely to be found at the place to be searched. *Manzo*, 2018 IL 122761, ¶ 35. Stated otherwise, there must be " ' "a *nexus* between the place to be searched and the evidence sought." ' " (Emphasis in original.) *Id.* (quoting *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016), quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (*en banc*)). A court may draw reasonable inferences from materials supplied to create the nexus. *People v. McCoy*, 135 Ill. App. 3d 1059, 1066 (1985). A complaint for a search warrant must allege facts and not suspicions, beliefs, or surmises. *People v. Barker*, 72 Ill. App. 3d 466, 468-49 (1979).

¶ 112   Probable cause is a fluid concept that turns on the assessment of probabilities in particular factual situations but is not readily reducible to a neat set of legal rules. *Gates*, 462 U.S. at 232. As

its name implies, probable cause speaks in terms of probability, not proof beyond a reasonable doubt. *Id.* at 238; *Manzo*, 2018 IL 122761, ¶ 29. The issuing judge is to make a " 'practical, common-sense decision' " based on all the circumstances set forth in the affidavit. *Manzo*, 2018 IL 122761, ¶ 30 (quoting *Gates*, 462 U.S. at 238). While it may not be easy to decide when an affidavit establishes probable cause, resolution of doubtful or marginal cases should be resolved by a preference to be given to warrants. *People v. Stewart*, 104 Ill. 2d 463, 477 (1984). Our function as the reviewing court is not to substitute our judgment for that of the issuing magistrate but, rather, to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *People v. McCarty*, 223 Ill. 2d 109, 153 (2006).

¶ 113 Defendant argues there was nothing in the search warrant complaint suggesting that defendant exchanged "messages," via Facebook or any other application, with Caraker or Campbell, and there was certainly nothing in the complaint to suggest that evidence related to the shooting of Campbell would be found in defendant's Facebook messages. We agree.

¶ 114 Although the search warrant complaint presented many facts that indicated defendant was involved in the shooting of Campbell, there were no facts to conclude evidence of this shooting was in his Facebook messages. There are no explicit references to Facebook. The only statement remotely indicating a connection was the statement that Campbell and Caraker exchanged messages. Such statement does not implicate defendant in any way or specify that the communication was through Facebook messages. Moreover, Sergeant Etherton's general statement regarding electronic evidence of crimes did not explicitly mention Facebook or social media and instead regarded only phones. There were also no facts to conclude that defendant used his phone to message through his Facebook. We further note that Sergeant Etherton did not provide his experience or training as an officer, and it was not indicated that his statement regarding

37

electronic evidence of crimes was based on his experience as a detective or officer. See *Manzo*, 2018 IL 122761, ¶ 60 (noting a previous case that found probable cause to search a home for narcotics activity based on evidence that the defendant distributed narcotics and an officer's experience as an investigator confirmed that narcotic distributors likely keep records of their trafficking activities in their home, but found the case inapplicable where the affiant officer in *Manzo* did not speak to his experience with drug investigations). Accordingly, there is nothing in the affidavit that suggests evidence of the shooting was more likely in defendant's Facebook rather "than the otherwise endless possibilities." See *id.* ¶ 45.

¶ 115    The State asserts the complaint established a connection between defendant and Caraker, where the search warrant complaint detailed the police investigation that placed defendant at the scene at the time of the shooting. It contends the logical nexus is the connection between defendant and Caraker. Given this nexus, the logical place to look for such explanation would be the social accounts of both Caraker and defendant, as stated in Sergeant Etherton's averment of the knowledge by law enforcement that "cellular phones are commonly used to facilitate criminal activity." The State further explains if Caraker was the sole person whom the victim could think would be angry with him, something had to transpire between Caraker and defendant from the time when Caraker and defendant left the victim's apartment on July 14 to the time of the shooting on July 15 to explain what motivated defendant to shoot the victim. We disagree.

¶ 116    The nexus shown by the affidavit was defendant, Caraker, and the offense, but such connections on their own do not establish a nexus between the shooting and defendant's Facebook. The State's argument is essentially that because there was evidence that defendant was the offender of this crime, there had to be evidence of such crimes on his phone. In determining whether there was sufficient nexus between the offense and property to be searched, our primary focus is not

38

whether the owner of the property to be searched was suspected of committing a crime. See *id.* ¶ 67. Under the State's logic, the police would be allowed to search the phone and social media of any person it can provide probable cause of committing an offense. This would deteriorate fourth amendment protections beyond recognition by allowing police free rein to procure search warrants for the Facebook accounts of every suspect in every case in which there is probable cause for the offense.

¶ 117   The search warrant affidavit failed, on its face, to provide the required connection that evidence of the shooting of Campbell would be located in defendant's Facebook account. Accordingly, the search warrant for defendant's Facebook lacked probable cause.

¶ 118   "The question of whether to exclude evidence, however, is a separate question from whether the search is legal." *Sutherland*, 223 Ill. 2d at 227. The exclusionary rule was created as a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a fourth amendment violation. *Davis v. United States*, 564 U.S. 229, 236 (2011). It is not designed to punish the errors of the court or redress an invasion of privacy but to deter future police misconduct. *Sutherland*, 223 Ill. 2d at 227. There are exceptions to the exclusionary rule, including the inevitable-discovery doctrine, which permits the admission of otherwise illegally obtained evidence if the State proves "by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984).

¶ 119   Defendant argues that the State forfeits any argument that the inevitable-discovery doctrine applies. We first note that forfeiture is a limitation on the parties and not on the reviewing court. *People v. Quezada*, 2024 IL 128805, ¶ 48. Nevertheless, an appellee, without taking a cross-appeal, may raise any argument to support the correctness of the circuit court's judgment, even if

39

the argument was not raised in the circuit court, as long as the argument has a sufficient factual basis in the record. *People v. Castleberry*, 2015 IL 116916, ¶ 22. Indeed, we may affirm the court's suppression ruling for any reason apparent from the record, regardless of the circuit court's reasoning for its conclusion. *People v. Buss*, 187 Ill. 2d 144, 205 (1999).

¶ 120   Accordingly, we will address the issue. "To demonstrate that a discovery was truly 'inevitable,' the prosecution must establish that it had probable cause and prove the existence of 'a chain of events that would have led to a warrant ... independent of the search.' " *United States v. Brown*, 328 F.3d 352, 357 (7th Cir. 2003) (quoting *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995)).

¶ 121   The messages at issue were exchanged with Caraker. The State obtained the records of Caraker's Facebook account through the execution of a search warrant. Moreover, Caraker was a State witness who testified to the existence and context of the messages. See *People v. Roberts*, 2021 IL App (3d) 190445, ¶ 44 (as a reason to find the inevitable-discovery doctrine applied to the defendant's Facebook messages, the court stated the messages were exchanged with a witness who testified for the State pursuant to a plea agreement). On an overhear, defendant also told the State's confidential source that he received a screenshot from Caraker in which Campbell called defendant a derogatory name. The State has therefore established by a preponderance of the evidence that defendant's Facebook messages would have been inevitably discovered by lawful means.

¶ 122   Defendant argues that the search warrant for Caraker's Facebook was subject to challenge because there was "no nexus between the shooting and Caraker's Facebook messages where the messages related for Campbell could had been obtained directly from Campbell." We disagree.

¶ 123   Defendant's argument is at odds with the nexus test, because whether the evidence could be found elsewhere is not a consideration. In determining the nexus, our focus is the evidence

40

sought and the place such evidence is alleged to be found. Thus, defendant does not present a convincing argument to undermine the State's position.

¶ 124 Accordingly, we find the search warrant lacked probable cause, but the State proved by a preponderance of the evidence that it would have inevitably discovered the evidence. The exclusionary rule is therefore inapplicable, and we affirm the trial court's denial of defendant's motion to suppress.

¶ 125                                  C. Other-Crimes Evidence

¶ 126 Defendant also contends through the testimony of Detective Cory Etherton, photographic evidence, and the audio and video recording of defendant's interrogation, that the trial court erred in allowing the State to introduce evidence of multiple stolen firearms that were unrelated to the shooting but recovered from his Dodge Stratus. He argues that the evidence of the stolen firearms was only to establish defendant's propensity to use guns where it was undisputed that none of the firearms recovered from the Dodge Stratus was the firearm used to shoot Campbell. Defendant further argues that such errors were not harmless.

¶ 127 The State continues to argue that the firearms evidence was admissible for the reliability of the testimony of the confidential source and defendant's knowledge, identity, and absence of mistake in connection to the Dodge Stratus. It further argues the firearms were so intertwined with the shooting of Campbell that leaving that evidence out would result in a gap in the story presented to the jury. The jury was not left to speculate defendant would possess such a weapon capable of shooting from this distance. Alternatively, the State contends that any error was harmless in light of the overwhelming evidence.

¶ 128 Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in

41

conformity ***." "The rationale for this rule is not that a defendant's bad character, as evinced by other bad acts, is irrelevant when he is charged with a crime." *People v. Dabbs*, 239 Ill. 2d 277, 284 (2010). Such evidence is admissible to prove a fact in issue, rebut an alibi defense, demonstrate consciousness of guilt, or establish motive, intent, absence of mistake or accident, identity, *modus operandi*, or a common design or scheme. *People v. Ingram*, 389 Ill. App. 3d 897, 901-02 (2009). Indeed, such evidence is admissible "if it is relevant for any purpose other than to show the defendant's propensity to commit crime." *People v. Pikes*, 2013 IL 115171, ¶ 11.

¶ 129   We review the trial court's admission of the other-crimes evidence under the abuse of discretion standard. *People v. Peterson*, 2017 IL 120331, ¶ 125. This is a deferential standard of review, and we will not reverse such decision unless it is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *Id.* Reasonable minds could differ about the admissibility of the evidence without requiring reversal. *People v. Donoho*, 204 Ill. 2d 159, 186 (2003). Moreover, "we may affirm the trial court's judgment based on any basis in the record, regardless of the court's reasoning." *People v. Schofield*, 2024 IL App (4th) 220961, ¶ 85.

¶ 130   We find guidance in our disposition in *People v. O'Neal*, 2025 IL App (5th) 240835-U, ¶ 4, where the defendant was charged with first degree murder, attempted first degree murder, and unlawful possession of a weapon by a felon. Defendant was arrested at his girlfriend's apartment. *Id.* ¶ 22 When police searched the apartment, they discovered three firearms in the closet of one of the bedrooms. *Id.* A forensic scientist determined the guns found were not the weapon used for the charged offenses. *Id.* ¶ 35. It was undisputed that the weapon was never recovered. *Id.* ¶ 41. On appeal, this court found the court did not err in allowing the other firearm evidence, finding

that we could not "hold that it was an abuse of discretion by the trial court to allow the State to present evidence supporting its claim that a thorough investigation was conducted." *Id.* ¶ 70.

¶ 131   Here, just as in *O'Neal*, "[t]he State provided evidence revealing that search warrants were issued, and weapons were found ***." *Id.* Importantly, the State conceded none of the weapons found were the weapon used in the shooting and that the weapon used in the shooting was not found. *Id.* We agree with *O'Neal* and similarly find that the trial court allowing evidence of the firearms found in defendant's trunk was not an abuse of discretion.

¶ 132   Defendant also contends the evidence should have been excluded where any probative value was entirely outweighed by the prejudicial effect, especially considering the egregious manner in which the State introduced the evidence. The State first presented defendant's interview, in which defendant stated that he did not use firearms and firearms were not his M-O. It then introduced the evidence of the stolen firearms to tell the jury that defendant did use firearms, that they were his M-O, that he kept them in his car, and that he therefore was the person who shot Campbell.

¶ 133   Even if other-crimes evidence is offered for a permissible purpose, it may nevertheless be precluded if its prejudicial effect substantially outweighs its probative value. *Pikes*, 2013 IL 115171, ¶ 11; Ill. R. Evid. 403 (eff. Jan. 1, 2011). "All evidence is prejudicial in the sense that it compels the factfinder in one direction or the other; the issue posed by Rule 403 is when it becomes unfairly so." (Internal quotation marks omitted.) *People v. Woodson*, 2023 IL App (1st) 191353, ¶ 101. "If other crimes evidence is admitted, it should not lead to a mini-trial of the collateral offense; the court should carefully limit the details to what is necessary to illuminate the issue for which the other crime was introduced." *People v. Nunley*, 271 Ill. App. 3d 427, 432 (1995). Given the State here did not make a mini-trial of the firearms and made clear the weapons were not used

43

in the shooting, we cannot find the court's weighing the probative value and prejudicial effect was an abuse of discretion.

¶ 134                                      D. Alleged Errors of the State

¶ 135   Lastly, defendant asserts the State elicited improper lay opinion testimony and made prejudicial statements during its closing arguments. Defendant acknowledges he forfeited the issue but requests review under both prongs of plain error and argues that counsel was ineffective for failing to object to the State's misconduct. Defendant further argues that even if this court finds a single error does not require reversal, the cumulative effect of the instances of misconduct requires reversal.

¶ 136   To preserve an error for review, the party must object at trial and present the issue in a posttrial motion. *People v. Nelson*, 235 Ill. 2d 386, 436 (2009). Here, counsel failed to do both. Accordingly, the issues are forfeited. However, forfeiture does not bar claims that counsel's incompetence resulted in the forfeiture. See *People v. Coleman*, 168 Ill. 2d 509, 522 (1995). Moreover, plain error review is an exception to forfeiture. *People v. Carlson*, 79 Ill. 2d 564, 576 (1980); see Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).

¶ 137   As noted above, to prove counsel provided ineffective assistance of counsel, "a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Cathey*, 2012 IL 111746, ¶ 23 (quoting *Strickland*, 466 U.S. at 694). Plain error review allows this court to consider a forfeited error when

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious

44

that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

Under either standard, we must first decide whether the State's actions were clear or obvious errors. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010); see *People v. Jones*, 2020 IL App (4th) 190909, ¶ 177.

¶ 138                             i. *Elicited Improper Opinion Testimony*

¶ 139   Defendant asserts the State elicited improper lay opinion testimony as to the ultimate question of fact where Sergeant Etherton, the lead investigator in the case, provided his opinion as to the ultimate question of fact that was to be decided by the jury. Defendant further contends such lay opinion testimony was improper because it was based on facts outside of Sergeant Etherton's personal knowledge.

¶ 140   Citing *Richardson v. Chapman*, 175 Ill. 2d 98, 107 (1997), and *People v. Novak*, 163 Ill. 2d 93, 102 (1994), among other cases, the State contends that a witness, expert or lay, may provide an opinion as to an ultimate issue without necessarily usurping the jury's province. It argues Sergeant Etherton's testimony was confined to the statements of facts of which he had personal knowledge having been a lead investigator in this case. Although he testified to these facts and conclusions he drew from those facts, the jury was not obligated to accept the conclusions he reached.

¶ 141   We agree with the State that either a lay or expert witness may express an opinion on an ultimate issue or material fact. Indeed, our rules of evidence state that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate

issue to be decided by the trier of fact." Ill. R. Evid. 704 (eff. Jan. 1, 2011). Thus, such opinion is proper if it is "otherwise admissible."

¶ 142    Any witness may provide both lay and expert testimony, but it is particularly common for law enforcement to serve in this dual capacity. *People v. Loggins*, 2019 IL App (1st) 160482, ¶¶ 82-83. However, "[a]ny given piece of testimony is either lay or expert testimony; it cannot be both." *Id.* ¶ 103.

¶ 143    Here, Sergeant Etherton was presented as a lay witness. While he testified that he worked as an officer for the city of Murphysboro since 2005, he did not specify his training or experience he relied upon in forming his opinion. Accordingly, Sergeant Etherton was a lay witness. See *People v. Crump*, 319 Ill. App. 3d 538, 542 (2001); *People v. Tellor*, 2025 IL App (5th) 230096-U, ¶ 94.

¶ 144    A lay witness is limited to testifying to opinions that are

> "(a) rationally based on the perception of the witness, and (b) helpful to a clear
>
> understanding the witness' testimony or the determination of a fact in issue, and (c)
>
> not based on scientific, technical, or other specialized knowledge within the scope
>
> of Rule 702." Ill. Evid. R. 701 (eff. Jan. 1, 2011).

Because the opinion must be rationally based on the witness's perception, the witness must have firsthand personal knowledge of the matter to testify to it. *Novak*, 163 Ill. 2d at 102-03, *abrogated on other grounds by People v. Kolton*, 219 Ill. 2d 353 (2006). This means the lay witness must base the opinion on "concrete facts perceived from the witness' own senses." *Novak*, 163 Ill. 2d at 103. Firsthand personal knowledge of fact is not secondhand knowledge and cannot be based on the statement of another. *Id.*

46

¶ 145 Sergeant Etherton had no personal knowledge of defendant's actions, as Sergeant Etherton did not firsthand observe defendant during the relevant time. See *Crump*, 319 Ill. App. 3d at 543; *Tellor*, 2025 IL App (5th) 230096-U, ¶ 95. His opinion that defendant shot Campbell was based on facts that he discovered secondhand during his investigation. Accordingly, Sergeant Etherton provided improper opinion testimony. See *People v. Suggs*, 2021 IL App (2d) 190420, ¶ 18; *Crump*, 319 Ill. App. 3d at 544; *Tellor*, 2025 IL App (5th) 230096-U, ¶¶ 95-96.

¶ 146                                     ii. *Closing Arguments*

¶ 147 Defendant also argues the State made a few improper and prejudicial statements during closing argument. Normally, a court will only excuse forfeiture of errors concerning comments made at trial where the comments are " 'so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process.' " *People v. Sims*, 192 Ill. 2d 592, 637 (2000) (quoting *People v. Kokoraleis*, 132 Ill. 2d 235, 283-84 (1989)); *People v. Kuntu*, 196 Ill. 2d 105, 129 (2001).

¶ 148 Every criminal defendant is entitled to a fair trial. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§ 2, 8; *People v. Wheeler*, 226 Ill. 2d 92, 121-23 (2007). A prosecutor's duty of fairness persists during closing arguments. *People v. Derr*, 316 Ill. App. 3d 272, 275 (2000).

¶ 149 Prosecutors are permitted wide latitude in closing argument. *Wheeler*, 226 Ill. 2d at 123. They may comment upon the evidence and any reasonable inference thereof, even if unfavorable to defendant. *People v. Rush*, 294 Ill. App. 3d 334, 340-41 (1998). In reviewing allegations of prosecutorial misconduct in closing arguments, we must examine the statements in the context of the entire closing argument. *Id.* at 340.

¶ 150                          a. Bolstering Credibility of Witnesses

¶ 151   Defendant contends that during closing argument, the State repeatedly gave the jury its opinion as to the credibility of Farice Campbell and Jolene Caraker. Specifically, defendant takes issue with the State's argument:

> "Farice Campbell, no angel, but he's honest, he sat and told the truth. It wasn't great for him, but he did. I believe him. He explained that he did give a remote control and boot back then, and might I add, that's the reason for this, a remote control and a boot. Even [defendant] said that she got the boot back and the remote, something was in it. Caraker was all over the place. But I believe Farice Campbell."

¶ 152   He also complains of the State's later argument:

> "Jolene Caraker is interesting. She took the stand and had trouble with it because she, it seemed, based on her testimony, that she felt responsible in some way. She had a tough time. But you get to decide if you believe her testimony. I believe it. She wanted to get back at Campbell. She didn't want to get fired. She sent that message to Security. What she was expecting Security to do, I have no idea, but he did something, he shot Farice Campbell."

¶ 153   The State argues although it could not vouch for the credibility of a witness, it was allowed to comment on a witness's credibility if witness credibility was an issue and the comments were based on the evidence. The State contends it argued the witnesses were believable after recounting their respective candor in admitting what each had said and to whom. Stated otherwise, the State expressed that each witness conveyed what they knew had happened, but not that it personally knew the witnesses were truthful. It further contends that nothing in its closing argument suggested it placed the integrity of the state's attorney's office behind the witnesses or that it knew additional

facts relating to the witnesses' credibility that were not disclosed. The State's argument is not well taken.

¶ 154   As a representative of the State of Illinois, a prosecutor stands in special relation to the jury and "must therefore choose his words carefully so that he does not place the authority of his office behind the credibility of his witnesses." *People v. Roach*, 213 Ill. App. 3d 119, 124 (1991). Thus, "[a] prosecutor may express an opinion based on the record and may draw reasonable inferences from the evidence presented; however, a prosecutor may not vouch for the credibility of a government witness or use the credibility of the State's Attorney's office to bolster a witness's testimony." *People v. Effinger*, 2016 IL App (3d) 140203, ¶ 24.

¶ 155   Here, during closing arguments, the prosecutor stated "I believe" Campbell and Caraker. In *People v. Boling*, 2014 IL App (4th) 120634, ¶ 125, the prosecution made several statements during closing arguments, referring to "We can believe" the witness and later stating, "I do think [the witness's] statements are credible." The appellate court found "we can believe" did not imply the prosecutor's personal opinion, but the State improperly expressed its own opinion with the "I" statement. *Id.* ¶ 127. Similarly, in *Roach*, 213 Ill. App. 3d at 123-24, the appellate court found improper the prosecutor's closing arguments that "I think [the witnesses] were sincere," and "I just didn't get the feeling that [the witness] was a liar." We find these cases persuasive and applicable here.

¶ 156   Like the above cases, "I believe" indicates the personal opinion of the prosecutor. The State's comments therefore explicitly and improperly informed the jury of its personal opinion that Campbell and Caraker did not fabricate their testimony. Although there was no explicit statement that the integrity of the state's attorney's office was behind the witnesses. The prosecutor's

49

statement put his stamp of approval on two of the key witnesses. This comment was therefore a clear error.

¶ 157                                      iii. *Defining Reasonable Doubt*

¶ 158   Defendant further asserts that during the State's rebuttal argument, the State argued, "You can have some questions. This is not beyond all doubt and the burden for you is not beyond all doubt, no questions, it's beyond a reasonable doubt. There is a difference. There is a huge difference." Citing *People v. Price*, 2021 IL App (4th) 190043, ¶ 160, defendant argues that while the State did not directly define the reasonable doubt standard, the argument improperly minimized the reasonable doubt standard. He contends a similar remark was held to be improper in *People v. Burman*, 2013 IL App (2d) 110807, ¶ 44.

¶ 159   "An attempt to define reasonable doubt presents a risk without any real benefit." (Internal quotation marks omitted.) *People v. Downs*, 2015 IL 117934, ¶ 32. This is so because "reasonable doubt" is self-defining that need no elaboration. *Id.* ¶ 19.

¶ 160   In *Burman*, the appellate court found improper the following statement: "Beyond a reasonable doubt. That is our burden. It's a burden we embrace. However, it's not beyond all doubt. It's not beyond an unreasonable doubt." *Burman*, 2013 IL App (2d) 110807, ¶¶ 21, 44. It reasoned that the statement was "more troubling than other comments found by Illinois courts to be insufficient to require reversal." *Id.* ¶ 44.

¶ 161   While the statements in *Burman* and this case place some boundary on the term "reasonable doubt," the statements in both cases did not minimize the burden of proof. See *People v. Barrow*, 133 Ill. 2d 226, 265 (1989); *People v. Whittaker*, 45 Ill. 2d 491, 495 (1970). The statements are factual, as "[p]roof beyond a reasonable doubt does not require the exclusion of every possible doubt." *People v. Johnson*, 368 Ill. App. 3d 1146, 1162 (2006).

¶ 162   Specifically in the context of closing arguments, our Illinois Supreme Court has explicitly found the statement "it is not proof beyond all doubt, it is not proof beyond any doubt" did not cross the boundary of propriety. *People v. Phillips*, 127 Ill. 2d 499, 528 (1989). Several other appellate courts found substantially similar language was not improper and did not minimize the State's burden of proof. See *People v. Thompson*, 2013 IL App (1st) 113105, ¶¶ 90-91 (finding nothing improper with the State asserting that the reasonable doubt standard "isn't beyond any doubt in the world, any crazy doubt" (emphasis omitted)); *People v. Burney*, 2011 IL App (4th) 100343, ¶¶ 66-68 (finding nothing improper with the State asserting that the reasonable doubt standard "does not mean beyond all doubt"); *People v. Laugharn*, 297 Ill. App. 3d 807, 810-12 (1998) (finding nothing improper with the State asserting that the reasonable doubt standard is "not beyond all doubt or any doubt" (emphasis omitted)). In the present case, the State discussed the reasonable doubt standard in substantially similar terms to the State's remarks in *Phillips*, *Thompson*, *Burney*, and *Laugharn*, which were all deemed proper. Accordingly, in light of the binding *Phillips* and other persuasive caselaw, we decline to follow *Burman*. Consequently, the State's remarks did not shift or minimize its burden of proof.

¶ 163   Moreover, defense counsel's closing argument indicated the verdict could not rest on inferences. He also repeatedly asked the jury not to assume or fill in the blanks and focus on unanswered questions. Defendant therefore cannot complain that the State erred. *People v. Dixon*, 91 Ill. 2d 346, 350-51 (1982) (a defendant cannot ordinarily claim error where the prosecutor's remarks are in reply to and may be said to have been invited by defense counsel's argument). The State also made several statements emphasizing the difficulty of the burden and the jury was properly instructed. Accordingly, we find the State's closing argument regarding reasonable doubt was not reversible error.

¶ 164                                    iv. *Cumulative Error*

¶ 165    Because there was error in the State's closing argument statements and eliciting lay opinion

testimony, we must decide whether these comments constitute plain error. There are two prongs

under which plain error relief may be granted. *People v. Presley*, 2023 IL App (5th) 230970, ¶ 30.

¶ 166    We first address defendant's argument that both errors fall under the first prong. To obtain

relief under the first prong, defendant must show that the evidence was closely balanced. *Id.*

¶ 167    Defendant contends the evidence was close where there were significant holes in the State's

case. He explains there were no eyewitnesses to the shooting, and no physical evidence connected

him to the shooting. Farice Campbell did not see who shot him. He argues the surveillance video

from the church was grainy and difficult to decipher, and the police could not be certain where the

bullets came from. Defendant also challenges the credibility of Jolene Caraker for not cooperating

with police and providing self-serving testimony and Brandi Pyatt for being a confidential

informant.

¶ 168    Not all cases based purely on circumstantial evidence are close. See *People v. Williams*,

2022 IL App (2d) 200455, ¶ 119 (collecting cases). The overhear proved defendant made

incriminating statements to Pyatt. Defendant's car was seen at the scene around the time of the

shooting and defendant indicated that he was driving the car around that time in his interview. The

Facebook messages showed defendant did not take well to Campbell calling him a derogatory

name, and that defendant and Caraker discussed Campbell's apartment hours before the shooting.

Defendant's jail letters also showed that he attempted to influence people to claim that they had

information regarding the shooting that was beneficial to defendant. In light of this evidence, we

find the evidence was not close. See *People v. Belknap*, 2014 IL 117094, ¶¶ 56-62 (finding

evidence was not close where circumstantial evidence supported testimony of jailhouse

52

informants). Moreover, if we find the evidence was not close for plain error purposes, defendant also cannot meet the prejudice requirement for ineffective assistance of counsel. See *People v. Holt*, 2019 IL App (3d) 160504-B, ¶ 47.

¶ 169    While, in his brief, defendant stated all the State's errors could be reviewed under second prong error, his argument regards only the State's closing arguments. Under the second prong, defendant must prove there was plain error and that the error was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Herron*, 215 Ill. 2d 167, 187 (2005). Error under the second prong of plain error analysis has been equated with structural error, meaning that automatic reversal is only required where an error is deemed to be a systemic error that serves to "erode the integrity of the judicial process and undermine the fairness of the defendant's trial." *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009). The Illinois Supreme Court recently explained the second prong plain error test remains true even when considering plain error. *Quezada*, 2024 IL 128805, ¶¶ 52-53. Thus, we must determine whether the cumulative impact of the State's improper comments " 'affected the fairness of the trial and challenged the integrity of the judicial process.' " *Id.* ¶ 55 (quoting *People v. Darr*, 2018 IL App (3d) 150562, ¶ 51).

¶ 170    While we do not condone the action, we cannot say the State's bolstering of two witnesses rose to the level of creating a pattern of unfairness or challenged the integrity of the judicial process. It did not stray so often from proper lines of argument that its cumulative effect deprived defendant of a fair trial. In fact, while the State provided its opinion of the credibility of witnesses, it also informed the jury that it was to weigh the witness's credibility and the weight afforded to their testimonies. As such, we find defendant has not established second prong plain error.

53

¶ 171                    III. CONCLUSION

¶ 172    While defendant's fourth amendment rights were violated by the State's search warrant that lacked probable cause, the trial court nevertheless did not err in admitting the Facebook messages under the inevitable-discovery doctrine. The court also did not err in admitting the firearm evidence where such evidence was admissible to show the State's investigation and was not substantially more prejudicial than probative. The State erred in eliciting improper lay opinion testimony and bolstering two witnesses during closing arguments, but such errors do not constitute plain error. However, defense counsel provided ineffective assistance for failing to file a motion to dismiss based on the speedy-trial statute where the charges were subject to compulsory joinder and the State failed to file the charges within 120 days of original charges. Accordingly, we (1) affirm the aggravated battery with a firearm and unlawful use of a weapon by a felon convictions, (2) vacate the attempted first degree murder and aggravated discharge of a firearm convictions, and (3) remand for resentencing.

¶ 173    Affirmed in part, vacated in part, and remanded.